JEFFREY L. LOOP, ESQ.
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: 212-238-8681
Loop@clm.com

**CV12 - 3159**

IRA S. LEVINE, ESQ.
351 Court Street
Brooklyn, NY 11231
Tel: 718-855-2110
ira@iraslevine.com

*MATSUMOTO, J.*

*Attorneys for Plaintiff Texas Eastern Transmission*, REYES, M.J

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

TEXAS EASTERN TRANSMISSION, LP,       :       Case No.
                                       :
                        Plaintiff,     :
                                       :       COMPLAINT
              - against -              :
                                       :
CERTAIN PERMANENT and TEMPORARY        :
EASEMENTS IN LANDS IN THE COUNTY       :
OF RICHMOND, STATE OF NEW YORK,        :
and THE CITY OF NEW YORK,              :
                                       :
                        Defendants.    :
-------------------------------------------------------- X

    Plaintiff Texas Eastern Transmission, LP ("Texas Eastern"), by its attorneys, Carter

Ledyard & Milburn LLP and Ira S. Levine, Esq., alleges upon information and belief as follows:

    1.    Texas Eastern is an interstate natural gas pipeline company that has been authorized

by the Federal Energy Regulatory Commission ("FERC") to construct an interstate natural gas

pipeline and related facilities in New Jersey and New York as part of the New Jersey-New York

7009925.3

Expansion Project ("NJ-NY Project").

2.     The pipeline will traverse one property in the Borough of Staten Island, County of Richmond, New York State that is owned by Defendant The City of New York (the "City"). In order to construct the pipeline, Texas Eastern needs to acquire temporary and permanent easements on the property as shown in Drawing No. LD-P-9104, which is attached hereto as Exhibit A.

3.     Texas Eastern has been unable to purchase such easements with the City due to the procedural time frames that the City is subject to under the New York City Charter. Therefore, Texas Eastern, pursuant to the power of eminent domain vested in it by the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(h), brings this action to condemn such easements and to have the Court ascertain the just compensation that must be paid for such easements.

### JURISDICTION AND VENUE

4.     Jurisdiction and venue are proper in this Court under 15 U.S.C. § 717f(h) because the property that is the subject of this action is located within the Eastern District of New York and the value of the easements to be taken on the property exceeds $3,000.

### PARTIES

5.     Texas Eastern is a Delaware limited partnership having its principal place of business in Houston, Texas and is a natural gas company as defined by § 2(6) of the NGA, 15 U.S.C. § 717a(6).

6.     The City is a municipal corporation duly organized and existing under the laws of the City and State of New York with an address at 100 Church Street, Room 5-241, New York, NY 10007.

2

7009925.3

7.     The City is named as a Defendant and condemnee in this action because it is the record owner of the property located in Richmond County that is the subject of this proceeding, designated as Block 1348, Lot 1 (commonly known as Arlington Yard), located adjacent to Western Avenue, pursuant to two deeds, each dated October 28, 1994 and recorded in the Richmond County Clerk's Office in Reel 5759, Page 1, and Reel 5759, Page 80 (the "Property").

## FACTS

8.     Before a natural gas company can construct and operate a natural gas transmission pipeline and related facilities, the company must obtain a Certificate of Public Convenience and Necessity from FERC ("Certificate"). On May 21, 2012, FERC issued a Certificate to Texas Eastern authorizing, among other things, the construction, operation and maintenance of approximately 20 miles of multi-diameter pipeline and related facilities that would be constructed from Linden, New Jersey, underneath the Arthur Kill to Staten Island, then underneath the Kill Van Kull to Bayonne and Jersey City, New Jersey, and then underneath the Hudson River to its terminus on the west side of Manhattan that will be used to transport natural gas in interstate commerce. See 139 FERC ¶ 61,138 (2012). A true copy of the Certificate is attached hereto as Exhibit B. The Certificate requires that the NJ-NY Project be completed and available for service by November 1, 2013.

9.     To complete construction of the NJ-NY Project in accordance with the Certificate and along the approved alignment, Texas Eastern must acquire permanent and temporary easements on the Property.

10.    Construction of the NJ-NY Project is scheduled to begin June 25, 2012.

11.    Pursuant to 15 U.S.C. § 717f(h), the Certificate confers upon Texas Eastern the power

3

of eminent domain to condemn land for the purposes of, among other things, constructing, operating and maintaining the NJ-NY Project.

## COUNT ONE
### Condemnation

12.     Texas Eastern repeats and realleges paragraphs 1 through 11 above and incorporates them as if fully set forth herein.

13.     Texas Eastern needs to acquire a permanent easement and temporary workspace easement on the Property for the purposes of, among other things, constructing, maintaining and operating the NJ-NY Project.

14.     The permanent easement on the Property will be 50-feet wide, except for the portion that crosses over the rail line commonly known as the Staten Island Railroad, which will be 10-feet wide. The permanent easement will occupy approximately 18,705.4 square feet or 0.43 acres. The temporary work space easement on the Property is located adjacent to the permanent easement and will occupy approximately 16,475.6 square feet or 0.38 acres. The boundaries of these easements are depicted on drawing No. LD-P-9104, which is attached hereto as Exhibit A.

15.     Texas Eastern is unable to purchase the necessary easement rights for the construction and installation of the pipeline on the Property because of the procedural requirements that the City is subject to under the New York City Charter for the disposition of property.

15.     Pursuant to § 7(h) of the NGA, 15 U.S.C. § 717f(h), Texas Eastern seeks to take the permanent and temporary easements on the Property by the power of eminent domain.

4

WHEREFORE, Texas Eastern requests that the Court:

1.      enter an Order of Taking allowing Texas Eastern to take the easements on the Property;

2.      issue an Order allowing Texas Eastern to immediately enter the Property to begin construction of the pipeline on the Property;

3.      ascertain the amount of just compensation to be paid to The City of New York and any other person having an interest in the Property for the easements taken by Texas Eastern; and

4.      award Texas Eastern such other relief as may be necessary or appropriate.

Dated: June 22, 2012

                                  TEXAS EASTERN TRANSMISSION, LP

                                  By its attorneys,


                                  _____
                                  Jeffrey L. Loop, Esq.
                                  Carter Ledyard & Milburn LLP
                                  2 Wall Street
                                  New York, NY 10005
                                  Tel: 212-238-8681
                                  Fax: 212-732-3232
                                  Loop@clm.com


                                  _____
                                  Ira S. Levine, Esq.
                                  351 Court Street
                                  Brooklyn, NY 11231
                                  Tel: 718-855-2110
                                  ira@iraslevine.com

5

7009925.3

Aidine ™ Enviro-Tab ™       Mixed
                            Sources Cert no. SW-COC-1942       



Aldine ™ Enviro-Tab ™     Mixed Sources Cert no. SW-COC-1942  ©159675C

# UNITED STATES OF AMERICA

## FEDERAL ENERGY REGULATORY COMMISSION

# CERTIFICATION



I hereby certify that the attached ___69___ pages are true and correct copies of a document on file with the Commission.

___5-25-2012___
**Date**

*Norma L. Anderson*
**Custodian**

*I hereby certify that the Custodian, or his designee, which signature appears above, is the official custodian of the records of the Federal Energy Regulatory Commission which certification is made and was such official custodian at the time of executing the above certification.*

**SECRETARY**

C-03-F-028

21-3046 FERC PDF (Unofficial) 05/21/2012

139 FERC ¶ 61,138
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Jon Wellinghoff, Chairman;
Philip D. Moeller, John R. Norris,
and Cheryl A. LaFleur.

Texas Eastern Transmission, LP                    Docket No.  CP11-56-000
Algonquin Gas Transmission, LLC


ORDER ISSUING CERTIFICATES AND APPROVING ABANDONMENT

(Issued May 21, 2012)

1.      On December 20, 2010, Texas Eastern Transmission, LP (Texas Eastern) and
Algonquin Gas Transmission, LLC (Algonquin) filed an application under sections 7(b)
and 7(c) of the Natural Gas Act (NGA)[1] requesting authorization for their proposed
New Jersey – New York Expansion Project (NJ-NY Project) to provide up to 800,000
dekatherms per day (Dth/d) of firm transportation service into the Borough of Manhattan,
New York.  The proposed NJ-NY Project will require the abandonment, replacement, and
construction of pipeline facilities in Middlesex County, Connecticut, Morris, Bergen,
Union, and Hudson Counties, New Jersey, and Rockland, Richmond, and New York
Counties, New York, and the lease of capacity on Algonquin's pipeline system by
Texas Eastern.  As discussed below, the Commission will grant the requested
authorizations, subject to the conditions discussed herein.

I.      **Background and Proposal**

2.      Texas Eastern is a limited partnership organized and existing under Delaware law
and is an indirect, wholly-owned subsidiary of Spectra Energy Corporation (Spectra).
Texas Eastern is engaged in the transportation and sale of natural gas in interstate
commerce, and is thus subject to the Commission's NGA jurisdiction.[2]  Texas Eastern's
system extends from Texas, Louisiana, and the offshore Gulf of Mexico area, through

---

[1] 15 U.S.C. §§ 717f(b), (c) (2006).

[2] 15 U.S.C. § 717a(d)(6) (2006).

- 2 -

Docket No.CP11-56-000

Mississippi, Arkansas, Missouri, Tennessee, Illinois, Indiana, Kentucky, Ohio, Pennsylvania, New Jersey, and New York.

3.      Algonquin is a limited liability company organized and existing under Delaware law and is an indirect, wholly-owned subsidiary of Spectra. Algonquin is engaged in the transportation and sale of natural gas in interstate commerce, and is thus subject to the Commission's NGA jurisdiction.[3] Algonquin's system extends from New Jersey through New York, Connecticut, Massachusetts, and Rhode Island.

4.      The applicants state that their proposal will enable significant volumes of gas from multiple upstream production areas[4] to reach the New Jersey and New York metropolitan market area by establishing new points of interconnection with the Public Service Electric and Gas Company (PSE&G) in Bayonne and Jersey City, New Jersey, and with Consolidated Edison Company of New York, Inc. (ConEd) on the lower west side of Manhattan. They assert their project is needed to eliminate existing operational constraints, mitigate the risk of severe disruption to ConEd's system, provide new and existing gas consumers (e.g., utilities and electric generators) with greater sources of gas supplies, meet escalating residential and commercial demands for energy, and improve regional air quality.

5.      The proposed project will enable Texas Eastern to provide 800,000 Dth/d of firm transportation service to the New Jersey and New York metropolitan market area, with 730,000 Dth/d able to be sourced from receipt points on Algonquin's system near Ramapo, New York, and Mahwah, New Jersey (the Lease Receipt Points). In addition, up to 100,000 Dth/d could be sourced from a receipt point on Texas Eastern's system in Lambertville, New Jersey.[5] Texas Eastern proposes to lease 730,000 Dth/d of firm transportation capacity on Algonquin's system for a primary term of 20 years under a Capacity Lease and Operating Agreement (Lease Agreement),[6] with the path of the lease

---

[3] *Id.*

[4] Gas from producing fields in the Gulf Coast, Midcontinent, and Rocky Mountain regions may be transported via Texas Eastern's system; gas from Canada, as well as liquefied natural gas (LNG) from other foreign sources, may be transported via Algonquin's system; and Appalachian supplies (in particular, gas imbedded in shale rock) may be transported via either Texas Eastern's or Algonquin's system.

[5] Applicants note that the sum of the maximum daily receipt obligations of 730,000 Dth/d at the Lease Receipt Points and 100,000 Dth/d at Lambertville may not exceed the 800,000 Dth/d capacity of the proposed project on any day.

[6] A copy of the Capacity Lease and Operating Agreement is provided in Exhibit I of the application.

-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                             - 3 -

extending from the Lease Receipt Points to the custody transfer point at the Algonquin-Texas Eastern interconnection near Hanover, New Jersey. The applicants state that by leasing capacity: (1) Texas Eastern can avoid the need to build new facilities to replicate Algonquin's New Jersey-to-New York route; and (2) customers will be able to obtain service along the entire transportation path by contracting solely with Texas Eastern.

6.     Texas Eastern held an open season from January 4 to 29, 2010, for prospective customers for new firm transportation capacity into Manhattan. In addition, Texas Eastern held a reverse open season from January 11 to 29, 2010, and Algonquin held a reverse open season from January 14 to 29, 2010, for existing customers willing to give up firm transportation capacity. As a result, Texas Eastern signed binding precedent agreements for the full 800,000 Dth/d firm transportation capacity of the proposed NJ-NY Project with Chesapeake Energy Marketing, Inc. (Chesapeake) for 425,250 Dth/d, Statoil Natural Gas LLC (Statoil) for 204,750 Dth/d, and ConEd for 170,000 Dth/d.

7.     Texas Eastern proposes to:

- install approximately 4.8 miles of 42-inch diameter pipeline that will replace certain segments of existing 12- and 20-inch diameter pipeline between the existing Linden Compressor Station in Linden, New Jersey, and the existing Meter and Regulating (M&R) Station 70058 in Staten Island, New York;

- construct approximately 15.2 miles of new 30-inch pipeline that would begin at existing M&R Station 70058, be routed through Staten Island and the cities of Bayonne, Jersey City, and Hoboken in New Jersey, and terminate at a new interconnection with ConEd in lower Manhattan;

- abandon approximately 8.95 miles of 12-, 20-, and 24-inch diameter pipeline between the Linden Compressor Station in Linden, New Jersey and M&R Station 70058 in Staten Island;

- construct two new M&R stations at the existing Hanover Compressor Station in Hanover, New Jersey, to facilitate deliveries from the leased capacity on Algonquin to Texas Eastern;

- construct two new M&R stations: the Bayonne M&R Station in Bayonne and the Jersey City M&R Station in Jersey City, to provide for deliveries to PSE&G;

- install additional yard piping at its existing Hanover Compressor Station in Hanover, New Jersey, to accommodate bi-directional flow;

521-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                              - 4 -

- install a 42-inch diameter pig launcher and relocate/replace two 20-inch and one 36-inch diameter pig receivers within the existing property line of the  Linden Compressor Station in Linden, New Jersey;

- remove two 12-inch diameter pig launchers within the property line of its existing M&R Station 187 in Linden;

- install a 42-inch diameter pig receiver and 30-inch diameter pig launcher and relocate a 30-inch diameter pig receiver within the property line of M&R Station 70058;

- install a 30-inch diameter pig launcher and receiver within the proposed Jersey City M&R Station;

- install four 30-inch diameter remote controlled mainline valves along the length of its new 30-inch diameter pipeline in Bayonne and Jersey City, and a 30-inch diameter block valve with a blind flange in an underground vault in Manhattan to accommodate a temporary receiver; and

- install new tap valves south of its existing M&R Station 70128 in Linden, New Jersey within the property line of its existing M&R Station 70058, and within the Jersey City M&R Station.

8.    Algonquin proposes to:

- install additional yard piping at the Cromwell Compressor Station in Cromwell, Connecticut;

- install additional yard piping at its existing Hanover Compressor Station in Hanover, New Jersey;

- modify facilities at the Mahwah M&R Station interconnection with Tennessee Gas Pipeline Company in Mahwah, New Jersey; and

- modify facilities at the Ramapo M&R Station interconnection with Millennium Pipeline Company, L.L.C. in Ramapo, New York.

9.    Texas Eastern estimates the cost of its portion of the NJ-NY Project to be $789,493,884.  Algonquin estimates that the cost of its portion of the project will be $67,524,524.

10.   Texas Eastern proposes to charge incremental recourse rates for firm and interruptible transportation service to recover the costs associated with the construction of

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                      - 5 -

the proposed facilities as well as the leased capacity. Texas Eastern proposes a firm
transportation (FT) recourse rate under its existing Rate Schedule FT-1 of $18.666 per
Dth and an interruptible transportation (IT) rate under its existing Rate Schedule IT of
$0.6137 per Dth, the 100 percent load factor derivative of the proposed FT recourse rate.

11.     Algonquin proposes to charge Texas Eastern a fixed monthly lease payment of
$986,581.56 for the 730,000 Dth/d of firm capacity that Texas Eastern will lease on
Algonquin's system. Algonquin asserts the proposed charge will recover the capital costs
of its construction of new facilities, as well as depreciation, operation, and maintenance
expenses, administrative and general costs, and property taxes associated with the new
facilities Algonquin will construct to facilitate the capacity lease arrangement.

## II.     Notice, Interventions, and Requests for Technical Conference

12.     Notice of the Texas Eastern's and Algonquin's joint application was published in
the *Federal Register* on January 13, 2011.[7] Timely, unopposed motions to intervene
were filed, as well as untimely motions to intervene. We find that those filing untimely
motions have shown an interest in this proceeding, and further find that granting these
motions at this stage of the proceeding will not cause undue delay, disruption, or
prejudice to the parties thereto; therefore, we will grant the late motions to intervene.[8]
Numerous comments were submitted, both in support of and in opposition to the
proposed project. We discuss below the issues raised in these comments.

13.     Texaco Downstream Properties Inc. and Chevron Land and Development
Company (collectively, Chevron) jointly request that the Commission convene a
technical conference on potential environmental impacts of a portion of the proposed
route that crosses the petitioners' 44-acre property in Bayonne, New Jersey, and to
consider alternatives to the proposed route.[9] Chevron contends that risks associated with
placing a pipeline across this property have not been adequately assessed in the
Commission's review of potential environmental impacts. The applicants submitted a
reply, arguing the Commission should reject the joint request on procedural and
substantive grounds.

---

[7] 76 FR 2360 (2011).

[8] *See* 18 C.F.R. § 385.214(d) (2011). The parties to this proceeding are listed in
Appendix A of this order. Timely, unopposed motions to intervene are granted by
operation of Rule 214 of the Commission's Rules of Practice and Procedure. 18 C.F.R.
§ 385.214(c) (2011).

[9] The Sierra Club, Food & Water Watch, and No Gas Pipeline jointly state their
support for Texaco's and Chevron's request; Evelyn Preuss also states her support.

1-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000.

14.   We have reviewed Chevron's request and conclude that all issues of material fact relating to routing are capable of being resolved on the basis of the written record; consequently, we find no cause to convene a technical conference. With respect to the specific concerns raised by Chevron, we believe the final Environmental Impact Statement (EIS) adequately takes into account the potential for construction-related contamination and measures to ensure the integrity of a slurry wall proximate to the approved route.[10] As required by Environmental Condition No. 20 of this order, prior to construction, Texas Eastern must submit, for the review and approval by the Director of the Office of Energy Projects (OEP), detailed plans regarding how Chevron's concerns about the slurry wall, groundwater contamination, and timing of construction will be addressed.

## III.   Discussion

15.   Because the applicants propose facilities for the transportation of natural gas in interstate commerce subject to the jurisdiction of the Commission, the abandonment, construction, and operation of the facilities are subject to the requirements of NGA section 7.

### A.   Certification of New Interstate Natural Gas Pipeline Facilities

16.   The Commission's statement of policy on the certification of new facilities (Certificate Policy Statement), provides guidance as to how the Commission will evaluate proposals for new natural gas transportation facilities, and establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.[11] The Certificate Policy Statement explains that in

---

[10] *See final EIS*, Section 3.6.1.4 (March 16, 2012).

[11] *Certification of New Interstate Natural Gas Pipeline Facilities,* 88 FERC ¶ 61,227 (1999), *orders clarifying policy,* 90 FERC ¶ 61,128 and 92 FERC ¶ 61,094 (2000). The Commission has also applied the Certificate Policy Statement in considering whether to approve a pipeline's lease of existing capacity from another pipeline. When an applicant proposes to lease capacity that has already been certificated and constructed by another pipeline, as is the case here, the Certificate Policy Statement's concerns with disruptions of the environment and the exercise of eminent domain are not implicated. However, the threshold requirement under the Certificate Policy Statement, that a pipeline must be prepared to financially support the project without relying on subsidization from its existing customers, is equally as applicable to a pipeline's lease of capacity on existing facilities as it is to the construction of new facilities. Similarly, whether the applicant has made efforts to eliminate or minimize any adverse effects the proposal might have on the applicant's existing customers and existing pipelines in the

(continued ...)

Docket No. CP11-56-000

deciding whether to authorize major new natural gas transportation facilities, the Commission balances public benefits against potential adverse consequences. The Commission's goal is to give appropriate consideration in evaluating proposals for new facilities to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, and the avoidance of unnecessary disruptions to the environment and the exercise of eminent domain.

17.     Under this policy, the threshold requirement is that an applicant proposing a new project be prepared to support the new project financially without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse impacts the project might have on the applicant's existing customers, existing natural gas companies in the market and their captive customers, or landowners and communities affected by the new facilities. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse impacts on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

18.     Texas Eastern is proposing incremental rates to recover the costs associated with its proposed new facilities and lease payments, which we find to be appropriate, for the reasons discussed below. Additionally, Texas Eastern's lease payments to Algonquin for capacity on its system will fully support Algonquin's costs associated with its proposed facilities during the 20-year primary term of the lease agreement. Thus, neither Texas Eastern's nor Algonquin's existing customers will subsidize the project, thereby fulfilling the threshold requirement of the Certificate Policy Statement. Further, neither Texas Eastern's nor Algonquin's existing customers should experience any degradation in service, nor should the proposed NJ-NY Project have any adverse impact on existing pipelines or their captive customers, since the new facilities will be transporting gas supplies to new delivery points in New Jersey and New York.

19.     We also find that the applicants have taken steps to minimize adverse impacts on landowners and the environment, such as planning to lease capacity on an existing pipeline instead of constructing a new pipeline. In addition, to accommodate landowner requests and future planning conflicts, Texas Eastern has made numerous modifications to the route of its pipeline. To mitigate concerns about safety and surface impacts in several neighborhoods, Texas Eastern has altered its pipeline construction methods to

---

market and their captive customers, is also relevant to our evaluation. *See CenterPoint Energy Gas Transmission Company*, 126 FERC ¶ 61,239, at PP 12-13 (2009).

Case 1:12-cv-03159-KAM-RER   Document 1   Filed 06/25/12   Page 17 of 78 PageID #: 17

include more horizontal directional drills (HDDs). Texas Eastern has also agreed to use a thicker-walled pipe than is required by the Department of Transportation (DOT), and in many locations will bury the pipe much deeper than required by the DOT regulations.[12] In addition, as discussed below, to the extent we have identified residual impacts to landowners and communities that persist, despite the applicants' minimization efforts (e.g., potential impacts on planned and existing developments), we are requiring the applicants to implement and adhere to specific measures to further mitigate such project impacts.

### Need for the Proposed Project

20.     To gauge interest in the proposed project, the applicants held open seasons in January 2010, which resulted in signed binding precedent agreements for the full 800,000 Dth/d of firm transportation capacity to be made available by the proposed project. The applicants submitted these agreements, signed by Chesapeake, Statoil, and ConEd. As observed in our Certificate Policy Statement, service commitments for new capacity constitute "important evidence of demand for a project," consequently, when "an applicant has entered into contracts or precedent agreements for the capacity," we take this as "significant evidence of demand for the project."[13]

21.     Despite prospective customers' commitments for the full capacity of the proposed project, opponents question the need for the project. They contend that the project is being put forth to create future demand for gas rather than to fulfill existing demand; that the demand for gas is decreasing and will continue to do so; or that any increase in demand can and should be met by relying on renewable sources of energy and by efforts to conserve energy.[14]

---

[12] DOT's Pipeline and Hazardous Material Safety Administration (PHMSA), acting through the Office of Pipeline Safety (OPS), is responsible for regulating and ensuring the safe and secure transportation of natural gas. For federal regulations applicable to natural gas pipelines, *see* 49 C.F.R. Parts 190-199 (2011).

[13] 88 FERC ¶ 61,227 at 61,748. We note that the applicants also meet the criteria in place prior to our Certificate Policy Statement, which required a project sponsor to demonstrate that it had entered into long-term executed contracts or binding precedent agreements for a substantial amount of the firm capacity of the proposed facilities. *See, e.g., El Paso Natural Gas Company*, 65 FERC ¶ 61,276, at p. 62,270 (1993).

[14] It was also suggested that if any of the gas transported by the proposed project is ultimately exported from the country, this would argue against the project, because exporting gas would reduce the volumes available to meet regional needs and cause volatility in supply and price. We note, however, that there is no indication in the record

(continued ...)

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                                                - 9 -

22.     In assessing of the need for a new project, it is not our goal to induce increased gas
demand. Rather, we consider whether proposed projects are needed to enable gas
supplies to reach and serve existing and future markets. In this case, the applicants have
demonstrated their project is needed by their willingness to bear the risk that the project's
costs can be recovered without subsidization from existing customers. The fact that the
entire capacity of the proposed NJ-NY Project is subscribed under precedent agreements
with 15- to 20-year terms is strong evidence that the market also believes that the project
is needed. Relying on demand reduction and renewable sources of energy were
considered as project alternatives in our environmental review and, as discussed below,
we conclude that these cannot serve as practical alternatives to the project.[15]

23.     We note that New York City's comprehensive sustainability plan, *PlaNYC 2030:
A Greener, Greater New York*, published in 2007, describes new natural gas
infrastructure as being "critical to the long term energy security" of the metropolitan area
and necessary to meet environmental and energy cost goals.[16] The 2010 *PlaNYC*
progress report identifies the proposed NJ-NY Project as a key component of the effort to
"supply cleaner burning natural gas" for the city.[17] Natural gas is expected to serve as a
partial substitute for heavy heating oil, which New York City is phasing out by
prohibiting the installation of new boilers that use heavy heating oil; requiring existing
boilers to stop using No. 6 oil by their next tri-annual permit renewal, beginning on
July 1, 2012; and requiring all boilers to switch to No. 2 oil or natural gas either upon
retirement or no later than 2030.

24.     ConEd has states that the proposed project would improve its ability to satisfy the
operational and load demands of its end users in Manhattan. Currently, a single interstate
pipeline, Transcontinental Gas Pipe Line Company, LLC, delivers gas to ConEd in
Manhattan. Interconnecting a second interstate pipeline would enhance the flexibility,

---

that any of the customers that have subscribed to capacity on the project contemplate
using that capacity to export natural gas. In any event, no gas may be exported from the
United States without the exporter having received prior NGA section 3 authorization to
do so from the Department of Energy (DOE). That DOE proceeding on any such
application would be the appropriate forum to address the commentors' concerns.

[15] *See* final EIS sections 3.1.1 and 3.1.2.3.

[16] *PlaNYC: A Greener, Greater New York,* at p. 112 (April 22, 2007).

[17] *PlaNYC: 2030 Progress Report for 2010,* at p. 55 (April 2010). The New York
and New Jersey metropolitan area does not currently meet health-based air quality
standards for ozone and fine particulates. *See* Exhibit F-1 of the Application, Resource
Report 9, Section 9.2.3.3 and Table 9.2-10.

Docket No.CP11-56-000                                                    - 10 -

reliability, and security of ConEd's gas supply. ConEd points out that if all of the buildings in its service territory currently using heavy heating oil switched to natural gas, its peak day gas consumption would rise by an estimate 60 percent or 680,000 Dth/d.[18] ConEd further states that timely authorization of proposed project is essential if it is to accommodate all the requests it is receiving for new firm gas service during the 2013/2014 winter season.[19]

25.    The NJ-NY Project will offer an additional, alternative transportation path to bring diverse supplies of gas to consumers in the New Jersey and New York metropolitan area. The project should enhance reliability and bring greater competition in energy pricing proposed project will make greater supplies of natural gas available to end users in the New Jersey and New York area that can serve base-load generation and co-generation facilities, and other uses. The new 15.2-mile long pipeline should enable additional end users in the New Jersey and New York metropolitan area access to enhance reliability and bring greater competition in energy pricing.

26.    Based on the benefits discussed above, including additional, more reliable transportation service for diverse sources of natural gas to the New York metropolitan area, the lack of identifiable adverse impacts on existing customers, existing pipelines or their customers, and the pipelines' efforts in minimizing the economic impacts of the project on landowners and neighboring communities, enhanced by the additional conditions imposed herein, we find that under the criteria of our Certificate Policy Statement and NGA section 7(c), and subject to the environmental discussion and conditions included in this order, the proposed project is required by the public convenience and necessity.

### B.    Abandonment

27.    Texas Eastern requests authorization to abandon by removal a total of 8.95 miles of 12-, 20-, and 24-inch diameter pipeline. These sections will be replaced with 30- and 42-inch diameter pipeline in order to accommodate the incremental expansion volumes while continuing to meet the requirement of Texas Eastern's existing customers. We find the proposed abandonment to be permitted by the public convenience or necessity and will approve the requested abandonment pursuant to NGA section 7(b), subject to compliance with the environmental conditions described below.

---

[18] *See* ConEd's *Supplemental Comments,* at pp. 2 and 4 (Nov. 18, 2011).

[19] *See* ConEd's letter filed May 15, 2012.

Docket No.CP11-56-000                                                  - 11 -

28.    The Commission views a lease of interstate pipeline capacity as an acquisition of a property interest in the lessor's pipeline.[20]  Accordingly, Algonquin will require NGA section 7(b) approval and permission to abandon the capacity by lease to Texas Eastern. For the reasons discussed herein below, we find the applicants' lease agreement to be consistent with our Certificate Policy Statement; therefore, we find the public convenience or necessity permit Algonquin's requested abandonment.

### C.    Rates

#### 1.    Incremental Firm and Interruptible Recourse Rates

29.    Texas Eastern proposes an incremental monthly recourse reservation rate for firm transportation service under Rate Schedule FT-1 of $18.666 per Dth.  The incremental rate is based on a first-year cost of service of $167,354,512 associated with the construction of the Texas Eastern's proposed project facilities and the $11,838,979 annual cost of the leased capacity from Algonquin.  The firm recourse rate is based on straight fixed-variable rate design and reflects billing determinants based on the full 800,000 Dth/d capacity of the proposed NJ-NY Project.  The rate of return and other factors used in determining the rate were derived from Texas Eastern's most recent cost-of-service settlement.[21]  Texas Eastern proposes an incremental recourse IT-1 rate of $0.6137 per Dth, the 100 percent load factor derivative of the FT-1 recourse rate, for interruptible service on the proposed NJ-NY Project.

30.    We have reviewed Texas Eastern's proposed cost of service, allocation, and rate design used to develop its initial recourse rates and find that they reasonably reflect current Commission policy.  The Certificate Policy Statement presumes an incremental rate for firm service is appropriate when the incremental rate would be in excess of the maximum system rate.[22]  Texas Eastern's proposed $18.666 per Dth recourse reservation rate is higher than its existing Zone M3 reservation rate of $5.058 per Dth.  Therefore, we will approve Texas Eastern's proposed incremental FT recourse rate as the initial rate for service on the proposed NJ-NY Project.

---

[20] *See Texas Eastern Transmission Corp.*, 94 FERC ¶ 61,139, at 61,530 (2001) and *Panhandle Eastern Pipe Line Company*, 73 FERC ¶ 61,137, at 61,390 (1995).  We note that if Algonquin wishes to terminate its lease of capacity to Texas Eastern, Algonquin will require section 7(c) certificate authorization to reacquire that capacity.  *See Islander East Pipeline Company, L.L.C. (Islander East)*, 102 FERC ¶ 61,054, at P 35 (2003).

[21] *Texas Eastern Transmission Corp.*, 84 FERC ¶ 61,200 (1998).

[22] 88 FERC ¶ 61,227 at P 61,745.

Case 1:12-cv-03159-KAM-RER Document 1 Filed 06/25/12 Page 21 of 78 PageID #: 21

31.     However, while Texas Eastern has appropriately calculated its proposed
incremental rate for interruptible service, Commission policy is to require a pipeline to
charge its current system IT rate for any interruptible service rendered on additional
capacity made available as a result of an incremental expansion that is integrated with
existing pipeline facilities.[23] This is because the pipeline generally is unable to determine
whether the capacity available on a given day is due to the existing facilities or to the
new, integrated expansion facilities. Conversely, the Commission has allowed pipelines
to use the 100 percent load factor derivative of the incremental FT recourse rate for the
development of an incremental IT rate for expansions that are not integrated with the
existing pipeline system.[24]

32.     The typical incrementally-priced expansion project consists of mainline
compression and/or looping, resulting in capacity which clearly functions as an integral
part of the existing system. Here, somewhat in contrast, the bulk of Texas Eastern's
NJ-NY Project consists of an extension of Texas Eastern's existing system to a new
delivery point in Manhattan, together with the lease of capacity on Algonquin. However,
although the project extends Texas Eastern's system to new delivery/receipt points, we
find the proposed facilities will nevertheless be integrated with Texas Eastern's existing
system. Therefore, Commission policy would require the use of Texas Eastern's current
applicable IT rate for interruptible transportation service on the proposed expansion.

33.     However, the Commission also recognizes that Texas Eastern's current IT rate
does not reflect the significant costs associated with the construction of the project in
such a densely developed area. The incremental IT rate calculated to reflect those costs is
over 200 percent greater than the existing system IT rate. Under these circumstances,
while allowing Texas Eastern to charge an incremental rate for interruptible service as
proposed would violate current Commission policy, we find at the same time that it
would not be appropriate to apply Texas Eastern's existing IT rate for Zone M3 of
$0.1953 per Dth as the IT recourse rate for interruptible service using Texas Eastern's
proposed new facilities and leased capacity, while its firm NJ-NY Project customers pay
the 100 percent load factor derivative of $0.6137 per Dth for firm service using that same
capacity. Therefore, while the Commission cannot under its current policy authorize
Texas Eastern's proposal as currently structured to charge an incremental IT rate, we
believe that Texas Eastern could substantially accomplish its rate objectives in an
acceptable manner by creating a new rate zone with separate maximum recourse rates for

---

[23] See, e.g., Gulf South Pipeline Company, LP (Gulf South), 130 FERC ¶ 61,015
(2010) and Kern River Gas Transmission Company, 117 FERC ¶ 61,077 at PP 313-14
and 326 (2006).

[24] See, e.g., Colorado Interstate Gas Company, 122 FERC ¶ 61,256 (2008).

Docket No.CP11-56-000

firm and interruptible service on the 15.2-mile pipeline extension to Manhattan. Accordingly, we would allow Texas Eastern to establish such a zone by means of its compliance filing of actual tariff records before the NJ-NY Project goes into service.[25]

## 2.   Incremental Fuel Rate

34.   Texas Eastern proposes to recover incremental fuel use and lost and unaccounted for gas associated with providing NJ-NY Project services through an incremental fuel charge of 0.58 percent. Texas Eastern states that, consistent with Commission-approved Texas Eastern fuel methodology, it will track changes in fuel use for these incremental services through its Applicable Shrinkage Adjustment (ASA) mechanism, and will adjust its periodic tracker mechanism to ensure existing customers do not subsidize the costs resulting from these new incremental services. We will approve Texas Eastern's incremental fuel rate as proposed.

## 3.   Incremental Access Charge

35.   Texas Eastern proposes to implement an Incremental Access Charge, equivalent to the 100 percent load factor derivative of the incremental FT-1 recourse rate, for service on a secondary firm or interruptible basis under Rate Schedules FT-1, IT-1, CDS, SCT and SS-1 to points on the proposed NJ-NY Project facilities. The Incremental Access Charge will apply to scheduled nominations to or from Lease Receipt Points, or points located immediately downstream of M&R Station 70058, to and including the Manhattan Point (Access Charge Points).

36.   Under Texas Eastern's proposal, customers receiving service under non-NJ-NY Project service agreements that nominate service under Rate Schedules FT-1, CDS, SCT, or SS-1, on a secondary basis between two Access Charge Points, would pay the Incremental Access Charge and incremental fuel charge, in addition to the reservation charges that are applicable to transportation service under their existing service agreements. Customers that nominate between one Access Charge Point and a point on the existing Texas Eastern system would pay the Incremental Access Charge and incremental fuel charge in addition to the reservation charges, commodity charges, and fuel charges that are applicable to transportation service under the existing rate schedule.

37.   Similarly, customers that nominate between two Access Charge Points under Rate Schedule IT-1 would pay the Incremental Access Charge and incremental fuel charge. Customers that nominate between one Access Charge Point and a point on the existing

---

[25] The firm and interruptible rates for such a rate zone may include the costs of the 15.2-mile extension, but not the costs associated with the Algonquin lease or the approved modifications to Texas Eastern's existing system.

Docket No.CP11-56-000                                              - 14 -

Texas Eastern system under Rate Schedule IT-1 would pay the Incremental Access
Charge and incremental fuel charge in addition to the commodity and fuel charges that
are applicable to transportation service under the Rate Schedule IT-1 service agreement at
that particular point.

38.     The Commission's policy for incremental expansions that are integrated with and
operated as part of a natural gas company's existing system is that customers are entitled
to access any point within the zone for which they are paying a reservation charge on a
secondary, as-available basis at the customer's otherwise applicable transportation rate.
The Commission has rejected proposals to charge firm mainline customers an additional
access charge to use expansion capacity that is integrated with and operated as part of a
pipeline's existing system.[26] As stated above, the Commission views the proposed
NJ-NY Project as creating capacity that will be integrated into Texas Eastern's existing
system, together with an extension of the system to Manhattan.

39.     Accordingly, we will deny the proposed Incremental Access Charge. However, as
indicated above, Texas Eastern may, as part of its compliance filing, create a new rate
zone, which would enable Texas Eastern to recover from existing shippers that transport
on the extensions on a secondary basis costs associated with the extension.

### 4.     Incremental Access Charge Points

40.     Hess Corporation (Hess)[27] is concerned that certain existing system points on the
Texas Eastern system also will be deemed to be receipt points for gas transported on the
proposed NJ-NY Project, and thus subject to the Incremental Access Charge. In order to
avoid any ambiguity during the nomination, scheduling, and invoicing processes, Hess
requests Texas Eastern clarify how customers will be able to designate whether a receipt
point is a system point or an Access Charge Point on the NJ-NY Project during the
nomination process.

41.     Texas Eastern responds that, as stated in the Definition section of its proposed pro
forma tariff, Access Charge Points will include: (1) Lease Receipt Points from

---

[26] *See, e.g., Equitrans, L.P.,* 136 FERC ¶ 61,046 (2011) and *Gulf South,* 120 FERC
¶ 61,291 (2007), *amending certificate and grant reh'g in part,* 122 FERC ¶ 61,162
(2008).

[27] Hess submitted its comments as a protest, and the applicants filed an answer in
response. While the Commission's procedural rules prohibit answers to protests, we may
waive this provision for good cause, and we do so here, and accept the applicants'
response, to insure a complete and accurate record. *See* 18 C.F.R. § 385.213(a)(2)
(2011).

Docket No.CP11-56-000                                                                - 15 -

Algonquin; and (2) points located immediately downstream of M&R Station 70058, to and including the new Manhattan Point. Texas Eastern observes that there are currently no points on its system that are downstream of M&R station 70058. Thus, if and when points located immediately downstream of M&R station 70058, to and including the Manhattan Point, are included as part of the proposed NJ-NY Project, they will not overlap existing system points.

42.      As discussed above, we are denying Texas Eastern's proposal to assess its proposed Incremental Access Charge. Further, if Texas Eastern chooses to establish a new rate zone for the new 15.2-mile pipeline, there will be no overlap of any existing . Texas Eastern system points with receipt points in the new zone. Therefore, there should be no ambiguity in the nomination, scheduling, and invoicing processes and existing and new customers should not incur any erroneous charges.

### 5.      Revenue Crediting

43.      Texas Eastern proposes to revise section 15.2 of the General Terms and Conditions (GTC) of its tariff to add a mechanism for crediting revenues actually received, net of variable costs, attributable to: (1) the Incremental Access Charge for secondary firm and interruptible service on the proposed NJ-NY Project; and (2) the reservation rates and commodity charges for service entirely on the new facilities under Rate Schedule FT-1 contracts, where the contractual direction of movement on its mainline is at all times in a direction opposite to the actual flow of gas in the pipeline. Texas Eastern proposes to credit Rate Schedule FT-1 customers on the proposed NJ-NY Project that are paying the maximum incremental recourse rate or a negotiated rate if the customer's negotiated rate agreement specifically provides for eligibility for credits.

44.      In addition, Texas Eastern states that in the Precedent Agreements, Texas Eastern and those prospective customers have agreed to share the customers' pro rata share of the revenue credits, to the extent that the actual cumulative annual revenues for the NJ-NY Project exceed the stated cumulative annual revenues resulting from the capacity of the project and the rate specified in the customers' negotiated rate agreement, which may be adjusted based on the difference between the estimated and actual construction costs of the NJ-NY Project.

45.      Hess is concerned that as currently proposed, existing customers that use the NJ-NY Project on a secondary firm basis, and pay the maximum Incremental Access Charge, will in fact subsidize the primary firm NJ-NY Project customers, unless existing customers receive a pro rata share of the revenue credits.

46.      Hess states that Texas Eastern proposes only to provide revenue credits to primary firm NJ-NY Project customers, even though existing firm customers using the proposed project capacity on a secondary firm basis are paying the maximum incremental rates, which are not based on separate revenue requirement allocations, but instead are the

Docket No.CP11-56-000                                                        - 16 -

100 percent load factor derivative of the primary firm NJ-NY Project customer rate. Hess maintains that because Texas Eastern has not allocated any separate revenue requirements to the secondary firm and interruptible NJ-NY Project services, but has proposed an incremental rate for such services, Texas Eastern should be required to credit the pro rata share of the revenue credits to secondary firm NJ-NY Project customers paying the maximum incremental rate. In addition, Hess asks Texas Eastern to clarify whether it intends to provide revenue credits to maximum rate firm NJ-NY Project replacement customers and to clarify its tariff to make clear that maximum rate firm NJ-NY Project replacement customers will be entitled to a pro rata share of the revenue credits.

In response, Texas Eastern states its willingness to modify its proposed revenue crediting mechanism to provide for sharing the revenue credits with secondary firm customers that pay the maximum Incremental Access Charge. Texas Eastern also states that, as reflected in section 15.2(a) of its pro forma tariff records, a replacement customer paying the maximum rate will be considered a NJ-NY Project Rate Schedule FT-1 maximum recourse rate customer and will be entitled to revenue credits. As discussed above, we are rejecting Texas Eastern's proposal to assess its proposed Incremental Access Charge. However, should Texas Eastern choose to establish a new rate zone for firm and interruptible service on the extension pipeline, we direct Texas Eastern to address in that filing how revenue from such services would be credited."

### 6.   **Algonquin Charges**

47.     Hess asks Algonquin to clarify that new Algonquin customers, replacement Algonquin customers, and existing Algonquin customers under new contracts using the Access Charge Points, including the Lease Receipt Points, will not be subject to any incremental NJ-NY Project charges. Hess believes that this is Algonquin's intent, but notes that the application only discusses Algonquin customers under existing contracts.

48.     In response, Algonquin confirms that any existing or future customer on its system that nominates the Lease Receipt Points and utilizes transportation entitlements under an Algonquin contract will not be subject to the project's proposed Incremental Access Charge. As discussed above, we are denying Texas Eastern authority to assess its proposed Incremental Access Charge. Moreover, no customer receiving service under a service agreement with Algonquin will be subject to any charges associated with services provided by Texas Eastern.

### 7.   **Lease**

49.     Historically, we view lease arrangements differently from transportation services provided under a pipeline's tariff. Because we view a lease of interstate pipeline capacity

as an acquisition of a property interest, a lessee generally needs to seek section 7(c) certificate authorization to enter into a capacity lease agreement.[28] If certificate authorization is granted to lease the capacity, the lessee in essence owns the capacity, with the capacity subject to the lessee's tariff. The leased capacity is allocated for use by the lessee's customers. The lessor, while it may remain the operator of the leased capacity, no longer has any rights to use that leased capacity for its own services.[29]

50.     Our practice has been to approve a lease if we find that: (1) there are benefits from using a lease arrangement; (2) the lease payments are less than or equal to the lessor's firm transportation rates for comparable service over the term of the lease; and (3) the lease arrangement does not adversely affect existing customers.[30] We find the lease agreement between Texas Eastern and Algonquin satisfies these requirements.

51.     The Commission has found that capacity leases in general have several potential public benefits. Leases can promote efficient use of existing facilities, avoid construction of duplicative facilities, reduce the risk of overbuilding, reduce costs, and minimize environmental impacts.[31] In addition, leases can result in administrative efficiencies for shippers.[32] Here, the proposed lease arrangement enables Texas Eastern's shippers to transport gas from supply sources to the New York City market with the overall construction of fewer, less costly facilities than would be needed without the lease. In addition, instead of executing separate contracts with two companies, the proposal provides Texas Eastern's customers seamless transportation across two pipeline systems, thereby allowing customers to avoid the administrative burdens of dealing with multiple pipelines.

52.     We consider whether lease payments will be less than or equal to the lessor's firm transportation rates for comparable service. Texas Eastern will make a fixed lease

---

[28] *See* note 21.

[29] *Texas Gas Transmission, LLC*, 113 FERC ¶ 61,185, at P 10 (2005).

[30] *Id. See also Islander East*, 100 FERC ¶ 61,276, at P 69 (2002) and *Midcontinent Express Pipeline LLC*, 124 FERC ¶ 61,089 (2008), *denying reh'g and granting clarification*, 127 FERC ¶ 61,164 (2009), *order on remand*, 134 FERC ¶ 61,155, at PP 4 and 13–17 (2011).

[31] *See, e.g., Dominion Transmission, Inc.*, 104 FERC ¶ 61,267, at P 21 (2003); *Texas Gas Transmission, LLC*, 113 FERC ¶ 61,185 at P 9; and *Islander East*, 100 FERC ¶ 61,276 at P 70.

[32] *Wyoming Interstate Company, Ltd.*, 84 FERC ¶ 61,007, at 61,027 (1998).

521-3046 FERC PDF (Unofficial) 05/21/2012

Docket No. CP11-56-000                                                                   - 18 -

payment of $986,581.56 per month for 730,000 Dth/d of capacity for the 20-year primary
term of the lease. This equates to a monthly lease demand charge of $1.351 per Dth,[33]
which is less than Algonquin's currently effective system reservation rate for firm
transportation service of $6.573 per Dth.

53.    We find that the lease arrangement will not adversely affect Texas Eastern's or
Algonquin's existing customers. Texas Eastern's proposed lease will use the capacity
created by Algonquin's proposed additional facilities and the capacity provided by
displacement. Therefore, the quality of service which Algonquin currently provides to its
existing customers will not be adversely affected by the lease. Texas Eastern has
designed an incremental firm transportation rate that includes the lease payments to
Algonquin, and an incremental fuel rate that recovers the costs of the lease capacity
and the associated fuel exclusively from the NJ-NY Project customers. Therefore,
Texas Eastern's existing customers will not be adversely affected by the lease. In
addition, each NJ-NY Project customer will pay the incremental fuel reimbursement rate
assessed by Algonquin on the leased capacity. This will ensure that existing Algonquin
customers do not subsidize the fuel costs resulting from the lease.

54.    We note that Algonquin will be fully at risk for the cost of the proposed additional
facilities and the proposed rate for the leased capacity. During the 20-year primary term
of the lease, Algonquin cannot reflect in its system rate the incremental costs associated
with the leased capacity. Therefore, there should be no subsidization of the leased
capacity by Algonquin's customers. Because the lease will provide benefits to the market
while imposing no burden on existing customers, we find that the public convenience and
necessity requires approval of the proposed lease agreement.

### 8.    Non-Conforming Provisions

55.    In addition to the negotiated rate provisions, Texas Eastern has also agreed to
terms of service with its prospective NJ-NY Project customers that include receipt point
rights, hourly delivery flexibility, a one-time renewal right, a most favored nations
provision with respect to the negotiated rate, revenue sharing, a contractual right of first
refusal, and credit support requirements. Texas Eastern asserts that these terms of
service: (1) reflect the unique circumstances involved with securing financial
commitments necessary to support the development and construction of the project;
(2) provide NJ-NY Project customers with contractual incentives necessary to make a
commitment to the project; and (3) provide Texas Eastern with credit assurances to
reduce its financial risk. Texas Eastern insists these terms of service do not present a risk
of undue discrimination because they reflect the unique circumstances of the prospective

---

[33] The monthly lease demand charge was calculated as follows: $986,581.56
divided by 730,000 Dth per day equals $1.351 per Dth per day.

Docket No.CP11-56-000                                                        - 19 -

NJ-NY Project customers and are needed to ensure that the proposed project gets built.
Texas Eastern requests that, to the extent necessary, the Commission approve these terms
of service.

56.     We find that the non-conforming terms of service constitute material deviations
from Texas Eastern's existing service agreements. In other proceedings, we have found
that non-conforming provisions may be necessary to reflect the unique circumstances
involved with constructing new infrastructure and to provide the needed security to
ensure the viability of a project.[34]  Here, we find the non-conforming terms of service to
be permissible because they will not present a risk of undue discrimination, affect the
operational conditions of providing service, or result in any NJ-NY Project customer
receiving a different quality of service from that available to Texas Eastern's other
customers.[35]

57.     When a contract or service agreement deviates materially from the form of service
agreement that is part of a company's tariff, the contract or service agreement must be
filed and made public.[36]  We require contracts and service agreements with material
deviations to be made public to prevent undue discrimination through secret rates or
terms. Accordingly, Texas Eastern must file, at least 60 days, and no later than 30 days,
before the in-service date of the proposed facilities, an executed copy of each non-
conforming agreement reflecting the non-conforming language and a tariff record
identifying these agreements as non-conforming agreements, consistent with section
154.112 of our regulations. The above determinations relate only to those items
described by Texas Eastern in the application and not to the entire precedent agreement
or the language contained in the precedent agreement.

                            **9.    Negotiated Rates**

58.     Texas Eastern states that it will provide services to NJ-NY Project customers at
negotiated rates in accordance with the negotiated rate authority set forth in GTC section
29 of its tariff. Texas Eastern must file all negotiated rate agreements, or a tariff record

---

[34] *See, e.g., Midcontinent Express Pipeline LLC,* 124 FERC ¶ 61,089 (2008) and
*Rockies Express Pipeline LLC,* 116 FERC ¶ 61,272, at P 78 (2006).

[35] *See, e.g., Gulf South,* 115 FERC ¶ 61,123 (2006) and, *Gulf South* 98 FERC
¶ 61,318, at 62,345 (2002).

[36] 18 C.F.R. § 154.1(d) (2011).

3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                                    - 20 -

describing the negotiated rate agreements associated with this project, in accordance with
our treatment of negotiated rates[37] and our statement of policy on alternative rates.[38]

## 10.   Recovery of Net Shipper-Supplied Gas

59.   Texas Eastern intends to: (1) recover incremental fuel use and lost and
unaccounted for gas associated with providing service on the proposed NJ-NY Project
facilities through incremental ASA percentages; and (2) track changes in fuel use
for these incremental services on an incremental basis through its ASA mechanism.
Texas Eastern proposes to record the value of the net under- or over-recovery of gas
received from customers for each incremental service on the NJ-NY Project in a separate
subaccount to Account 174, Miscellaneous Current and Accrued Assets.[39]

60.   Texas Eastern contends that since the net under- or over-collections of gas on its
project will represent actual claims or obligations to third parties that will be settled
within 12 months, it is more appropriate to record these claims as current assets or
liabilities in Account 174, Miscellaneous Current and Accrued Assets. Texas Eastern
believes these assets and liabilities will not be the result of a specific rate action of the
Commission and do not fit within the Commission's definition of regulatory assets or
liabilities.[40] We disagree, and find the use of the regulatory assets or liabilities accounts
would be appropriate. Since Texas Eastern has a tracking mechanism in its tariff
requiring it to record the value of the net under- or over-recovery of gas received from
shippers, it is appropriate to record such amounts in Account 182.3, Other Regulatory
Assets, or Account 254, Other Regulatory Liabilities, consistent with our accounting
requirements.[41]

---

[37] See, e.g., Texas Eastern, 133 FERC ¶ 61,220 (2010).

[38] Alternative to Traditional Cost-of-Service Ratemaking for Natural Gas
Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines,
74 FERC ¶ 61,076, at 61,231, order granting clarification, 74 FERC
¶ 61,194, reh'g denied, 75 FERC ¶ 61,024 (1996).

[39] See Texas Eastern's August 16 and November 10, 2011 responses to staff's
July 28 and November 3, 2011 data requests for additional information.

[40] See Texas Eastern's December 12, 2011 response to staff's December 5, 2011
data request for additional information.

[41] See Revisions to Uniform System of Accounts, Forms, Statements, and Reporting
Requirements for Natural Gas Companies, Order No. 581, FERC Stats. & Regs.,

(continued ...)

521-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                    - 21 -

61.     Texas Eastern proposes to debit Account 142, Customers Accounts Receivable, and credit Account 174 to record excess system gas that is auctioned to third parties. The gas that Texas Eastern auctions to third parties constitutes a sale of gas. Therefore, Texas Eastern must recognize revenue from the sale of such gas by debiting Account 142 and crediting an appropriate revenue account. Texas Eastern must also reverse the amount of the auction proceeds from the system gas sale recorded earlier from the revenue account and credit Account 254, consistent with our accounting requirements.[42]

**D.      Environmental**

**1.      Pre-filing Review**

62.     Commission staff began its initial review of the NJ-NY Project following its approval of the applicants' use of the pre-filing process on April 23, 2010, in Docket No. PF10-17-000. As part of the pre-filing review, a *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed New Jersey - New York Expansion Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings* (NOI) was issued on July 16, 2010.

63.     Commission staff held four public scoping meetings in August 2010 to provide the public with an opportunity to learn more about the proposed project and to comment on environmental issues that should be addressed in the draft EIS.[43] Transcripts from the meetings were placed into the public record for this proceeding. A total of 99 individuals provided verbal comments on the proposed project at the scoping meetings, and 719 written comments were received from federal, state, and local agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners; and other interested stakeholders.[44]

---

Regulations Preambles, January 1991-1996 ¶ 31,026 at 31,456 (1995) and 18 C.F.R. Part 201 (2011).

[42] *Id.*

[43] The public scoping meetings were held in Bayonne, New Jersey, on August 2, 2010; the Borough of Staten Island, New York City, New York, on August 3, 2010; Jersey City, New Jersey, on August 4, 2010; and the Borough of Manhattan, New York City, New York, on August 5, 2010. Approximately 460 people attended the public scoping meetings.

[44] Table 1.3-1 of the final EIS provides a detailed and comprehensive list of issues raised during scoping.

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                                              - 22 -

## 2.   Application Review

64.    Commission staff evaluated the potential environmental impacts of the proposed project in the draft and final EIS, in accordance with the requirements of the National Environmental Policy Act of 1969 (NEPA).[45]  The U.S. Environmental Protection Agency, DOT, U.S. Army Corps of Engineers (COE), New York City Mayor's Office, and New York City Department of Environmental Protection all participated as cooperating agencies in the preparation of the draft and final EIS.

65.    The draft EIS was issued on September 9, 2011,[46] and was sent to the environmental mailing list, which was expanded to include landowners potentially affected by some of the routing alternatives being considered.  A *Notice of Intent to Hold Public Meetings and Hear Public Comment on The Proposed New Jersey - New York Expansion Project Draft Environmental Impact Statement* was issued on September 16, 2011.[47]  Four public meetings were held in October 2011 to receive comments on the draft EIS.[48]  A total of 129 people provided verbal comments, and 6,411 written comments were submitted in response to the draft EIS.  The major environmental issues raised in these comments include alternatives, cumulative impacts, soil and groundwater contamination, special status species, planned and existing developments, air quality, noise, and safety.[49]

66.    On March 16, 2012, the final EIS was issued and public notice of its availability was published in the *Federal Register*.[50]  The final EIS addresses geology; soils; water resources; wetlands; vegetation; wildlife and fisheries; special status species; land use,

---

[45] 42 U.S.C. §§ 4321 *et seq.* (2006).  *See* 18 C.F.R. Part 380 for the Commission's NEPA-implementing regulations.

[46] 76 FR 57,728 (2011).

[47] 76 FR 59,679 (2011).

[48] The draft EIS comment meetings were held in the Borough of Staten Island, New York City, New York, on October 17, 2011; Bayonne, New Jersey, on October 18, 2011; Jersey City, New Jersey, on October 19, 2011; and the Borough of Manhattan, New York City, New York, on October 20, 2011.  Approximately 800 people attended the public comment meetings.

[49] *See* final EIS Table 1.3-1 at pp. 1-9 to -11.

[50] A *Notice of Availability for the Final EIS* was published by the U. S. Environmental Protection Agency.  77 FR 17472 (2012).

521-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                      - 23 -

recreation, and visual resources; socioeconomics; cultural resources; air quality and
noise; reliability and safety; cumulative impacts; alternatives; and timely comments
received on the draft EIS.  The final EIS finds that the project would result in limited
adverse environmental impacts if the project is constructed and operated in accordance
with applicable laws and regulations.  However, these impacts would mostly occur during
construction and be reduced to less-than-significant levels with the implementation of the
applicants' proposed mitigation and our staff's recommendations.  Major issues raised
during scoping and comments in response to the draft EIS are addressed in the final EIS
and summarized below.

### a.    Alternatives

67.    Draft EIS section 3.0, Alternatives, evaluated alternatives to the proposed NJ-NY
Project to determine whether there were technically and economically feasible and
environmentally preferable alternatives.  The draft EIS found that none of the alternatives
– including taking no-action, conservation coupled with energy supplied by renewable
sources, increased reliance on nuclear power, increased reliance on other fossil fuels, or
modifying existing pipeline systems – could be expected to result in fewer adverse
environmental impacts while still meeting the proposed project's objectives.  In final EIS
sections 3.1.1, Energy Conservation/Energy Efficiency, and 3.1.2, Non-Gas Energy
Alternatives, staff gave further consideration to the use of alternative energy sources and
the potential effects of making more effective use of existing energy supplies.  We concur
with the determination that none of the alternatives to the proposed project, including the
combination of conservation and renewable energy sources, could serve as a satisfactory
substitute for the reliable and competitively priced power that the proposed project would
provide.

68.    During scoping, commentors expressed concern with the pipeline's proposed route
and stressed the need for additional analysis of alternative routes.  Draft EIS section 3.0
assessed major and minor route variations, landowner requested alternatives, three marine
alternatives for offshore construction, aboveground facility site alternatives, and
workspace alternatives.  After the draft EIS was issued, commentors proposed additional
route alternatives.  Texas Eastern proposed 27 route variations, and mentioned the
possibility of an additional M&R station.[51]  In the final EIS, section 3.0 was updated to
evaluate these additional proposals.

69.    Final EIS section 3.6, Route Alternatives and Variations Identified, considered the
additional routing and variation proposals which were presented after the draft EIS was
issued.  Staff reviewed all the alternatives suggested by commentors and compared them

---

[51] The station is to be located at the International Matex Tank Terminal in
Bayonne.

Docket No.CP11-56-000

to the applicants' initial proposal to determine if any of the alternatives would be technically, economically, and environmentally preferable. Against the evaluation criteria developed to compare each alternative to the proposed route, 26 of 27 route variations proposed by Texas Eastern were accepted and none of the commentors' suggested alternatives were found to be preferable.

### b.   Cumulative Impacts/Shale Gas

70.     Final EIS sections 1.3, Public Review and Comment, and section 4.13, Cumulative Impacts, reviewed comments received during and after the scoping process and in response to the draft EIS that express concern with drilling for gas in shale formations. Commentors urge that the cumulative impacts of developing shale reserves be taken into account.[52]

71.     In evaluating cumulative impacts, the Commission considers: (1) the area in which the effects of the proposed action would be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions – past, present, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.[53]  Natural gas exploration, production, and gathering, and the facilities and pipelines used for these activities, are not regulated by the Commission, but by the affected region's state and local agencies with jurisdiction over these functions.

72.     As discussed in final EIS section 4.13, although the proposed NJ-NY Project may transport gas produced from shale formations, particularly the Marcellus, the development of shale gas resources is not dependent on this proposed project. Similarly, given the multiple sources of gas that will be able to be delivered to the proposed project,[54] this project is not dependent on the development of shale gas resources to achieve its stated goals. Consequently, for purposes of the NEPA analysis, the local

---

[52] The unconventional development of natural gas resources in shale formations has increased significantly in recent years. In closest proximity to the proposed project is exploration and production in the Marcellus formation in the Appalachian Basin, which extends primarily from New York through Pennsylvania and into West Virginia and Ohio.

[53] See, e.g., Grand Canyon Trust v. Federal Aviation Administration, 290 F.3d 339, 345 (D.C. Cir. 2002) and San Juan Citizens Alliance v. Stiles, 654 F.3d 1038, 1056 (10th Cir. 2011).

[54] See note 4.

Docket No.CP11-56-000                                                    - 25 -

resources that may be affected by the development of the Marcellus and other shale
formations would not be affected by the proposed project, and local resources affected by
the project would not be affected by shale development. Finally, the proposed facilities
will be located in a developed urban area, not in an area of shale development. Thus, we
find that activities related to gas production from shale formations are not causally related
to the NJ-NY Project.

73.     Because cumulative impacts for the purpose of the NEPA analysis are those which
result from the incremental impact of the proposed project "when added to other past,
present, and reasonably foreseeable future actions,"[55] and because there is no causal
relation between the proposed project and past, present, and future shale development,
there is no cause to consider the impact of the project on shale development.[56] This
project is driven by a desire to bring additional, reliable, competitively-priced gas
supplies to New Jersey and New York end users – it is not designed to serve as a
gathering system for gas from the Marcellus shale. The development of the Marcellus
and other shale reserves is expected to proceed over decades, and will do so with or
without the proposed project. The scope, scale, and speed of shale gas development
cannot be accurately estimated, i.e., it is not "reasonably foreseeable." Consequently, the

---

[55] 40 C.F.R. § 1508.7 (2011).

[56] *See, e.g., Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1043 (D. Minn. 2010).
The court upheld the U.S. Department of State's decision, in considering a request for a
Presidential Permit for a U.S. pipeline intended to transport oil extracted from tar sands in
Canada, not to include the domestic consequences of increased Canadian oil production
in its cumulative impacts assessment because "the Canadian tar sands are being
developed independently from" the proposed pipeline and the pipeline is "not the only
means to transport oil from the tar sands," thus "there is not a sufficient causal
relationship" between the pipeline and Canadian oil production. *See also Gulf
Restoration Network v. DOT*, 452 F. 3d 362, 370-71 (5th Cir. 2006). The court upheld
DOT's decision, in considering an application for a new offshore LNG deepwater port,
not to include three other planned offshore LNG ports in its cumulative impacts
assessment, because although applications for the terminals had been filed, a draft EIS
had yet to be issued, and given "that the occurrence of any one of a number of
contingencies could cause the plans to build the ports to be cancelled or drastically
altered," the consequences of the construction of these three other ports "were not
'reasonably foreseeable future actions,' or, as this court has put it, actions that 'a person
of ordinary prudence would take [] into account in reaching a decision.'" *Citing City of
Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005).

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                    - 26 -

past, present, and future effects of shale gas development are outside the scope of our NEPA cumulative impacts assessment.[57]

c.   <u>**Soil and Groundwater Contamination**</u>

74.    Comments were received concerning areas of existing contamination in the proposed project area.  As discussed in the final EIS sections 4.2, Soils, 4.3, Water Resources, 4.8.3, Existing Residences, Commercial and Industrial Facilities, and Planned Developments, and 4.8.6, Hazardous Waste Sites, multiple areas of known soil and groundwater contamination would be crossed by the proposed route of the new pipeline. To address both known and unanticipated contamination, Texas Eastern and Algonquin prepared a draft Excavation Management Plan (EMP), which identifies procedures to be employed when contaminated soil and groundwater are encountered during construction. The applicants state that the EMP will be submitted to the New Jersey Department of Environmental Protection (NJDEP) and New York State Department of Environmental Conservation (NYSDEC) for their review and consultation.  To ensure the EMP is consistent with provisions set forth by each of these agencies, and that any contaminated material encountered during construction is handled appropriately, Environmental Condition No. 23 requires that prior to construction, Texas Eastern and Algonquin must file with the Commission a final EMP, with documentation of consultations with NJDEP and NYSDEC regarding the EMP.

75.    The applicants are implementing a soil and groundwater sampling program to identify and characterize existing contamination in the area of the proposed project. To ensure that contamination in the project area is accurately identified, Environmental Condition No. 15 requires that construction cannot begin until the results of the sampling program, and any additional mitigation measures not included in the EMP, are submitted to the Commission.  Specific concerns were raised about the vertical migration of contaminants during the HDD operations.  Texas Eastern states it will install various diameter steel casings at the HDD entry and exit points to avoid migration of contaminants into a lower aquifer.  Texas Eastern plans to remove several of these

---

[57] *See Central New York Oil and Gas Company, LLC*, 137 FERC ¶ 61,121, at ¶ 60 (2011).  In response to similar concerns regarding the development of Marcellus reserves, the Commission explained that "a quantitative analysis of the cumulative impacts of Marcellus Shale development" was not undertaken because "the widespread nature and uncertain timing of gas well drilling relative to construction of the [proposed project] make it difficult to identify and quantify cumulative impacts:  since the development of natural gas reserves in the formation is expected to take 20 to 40 years due to economics and other factors, the exact location, scale, and timing of future Marcellus Shale upstream facilities that could potentially contribute to cumulative impacts in the project area is unknown at this time."

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No. CP11-56-000                                                              - 27 -

casings, which are smaller in diameter than the pipeline, prior to the completion of the
HDD. To ensure that the vertical migration of contamination is avoided at the HDD
entry and exit points, Environmental Condition No. 16 requires Texas Eastern to:
(1) provide additional information to the Commission describing when smaller diameter
casings would be removed and how vertical migration of contaminants would be avoided
once such casings are removed; and (2) explain its justification for not using a larger
diameter casing that would remain in place until the HDD pipe pullback procedure is
completed.

### d.   Special Status Species

76.     As described in final EIS sections 4.6, Wildlife and Aquatic Resources, and 4.7,
Special Status Species, ten federally listed and 34 exclusively state listed special status
species potentially occur in the vicinity of the proposed project. To comply with section
7 of the Endangered Species Act (ESA), Commission staff requested that the U.S. Fish
and Wildlife Service (FWS) and the U.S. Department of Commerce, National Oceanic
and Atmospheric Administration, National Marine Fisheries Service (NOAA Fisheries),
consider the draft EIS as the biological assessment identifying endangered or threatened
species likely to be affected by the proposed NJ-NY Project.[58] The draft EIS concluded
that construction and operation of the project would either not affect or may affect, but
would not likely adversely affect, the federally listed species. The analysis also
concluded that the project would not be expected to have significant adverse impacts on
the state listed species.

77.     By a letter dated October 31, 2011, the FWS concurred with the determinations of
the draft EIS; therefore, ESA section 7 consultation with FWS has been completed. To
ensure consultation with NOAA Fisheries is completed, and that we receive concurrence
with its determination of effect on the federally listed shortnose sturgeon, Atlantic
sturgeon, and sea turtles, staff has requested that NOAA Fisheries consider the final EIS
as the biological assessment and included final EIS recommendation 20 to ensure that
construction activities in the Hudson River would not begin until Commission staff
completes consultation with NOAA Fisheries on these species. By a letter dated May 8,
2012, NOAA Fisheries concurred with the determinations of the final EIS. Therefore,
ESA section 7 consultation with NOAA Fisheries has been completed, and final EIS
recommendation 20 is not included in this Order.

### e.   Planned and Existing Developments

78.     Comments address the routing of the pipeline and its potential impacts on planned
and existing residential, commercial, and industrial property developments. As described

---

[58] See 16 U.S.C. § 1536 (2006).

in final EIS section 4.8.3, conflicts with several developments would be minimized due to pipeline route modifications and would be avoided by using HDD in constructing segments of the pipeline. Where the pipeline would be installed within existing roadways, Traffic Management Plans would be implemented. Specific construction measures to minimize disruption to the extent practicable would be developed for properties along the pipeline route, specifically 99 Hook Road and properties belonging to the Port Authority; Chevron; 380 Development, LLC; and Newport Associates Development Company (Newport).

79.      As noted above, Chevron's concerns related to contamination and the timing of construction are addressed by Environmental Condition No. 20, which requires that construction near Chevron's property cannot begin until site-specific plans have been filed for review and approval by the Director of the OEP that addresses Chevron's concerns about a slurry wall, groundwater contamination, and timing of construction, and describes the measures Texas Eastern would implement to avoid adversely impacting Chevron's mitigation and remediation efforts. In addition, Environmental Condition No. 25 requires that Texas Eastern develop a site-specific plan for 99 Hook Road to address the owner's concerns regarding impacts on the property and the businesses located there. As described in final EIS section 4.9.5, Transportation and Traffic, and included in Appendix L, staff evaluated draft Traffic Management Plans for the project area. In response, Environmental Condition No. 24 requires that final Traffic Management Plans be filed prior to construction.

### f.     Air Quality

80.      Commentors express concerns about air quality impacts associated with the construction and operation of the proposed project. We concur with the finding in final EIS section 4.11.1, Air Quality, that air quality impacts associated with construction, including construction equipment emissions and fugitive dust, would generally be temporary and localized, and are not expected to cause or contribute to a violation of applicable air quality standards. To ensure impacts associated with fugitive dust are minimized, Environmental Condition No. 27 requires the applicants to prepare a Dust Control Plan that specifies the mitigation measures to be used for dust abatement, including specific measures to prevent contaminated soils from becoming airborne. We also note that to the extent natural gas may displace coal and oil for power generation and heating, the air quality in the region can be expected to improve.

81.      To reduce air emissions, the applicants would limit engine idling to a maximum of three minutes whenever construction equipment is not in use. The only new source of operational air emissions associated with the NJ-NY Project would be from the proposed

Docket No.CP11-56-000                                                                -29-

heaters at four of the seven[59] new M&R stations, as well as periodic blowdown events associated with the pipeline facilities. The emissions from operation of the new stationary sources would be designed to meet all applicable regulatory air quality requirements. No increase in compression horsepower or changes to the method of operation of the compressors is proposed.

82.    Comments call attention to potential health risks of releasing radon when natural gas is burned indoors. Final EIS section 4.11.1.5, Radon Exposure, reviewed available studies, and we concur with the conclusion that the indoor exposure to radon from gas used in a residence should be limited. Radon initially entrained in extracted gas can be expected to be purged in part in the course of gas processing and to decay during transport from wellhead to burnertip. As the applicants observe, the gas carried in the proposed pipeline will not come from a single source, but will be amalgamated from various supply basins, and be comingled with multiple gas streams in transport over interstate systems en route to the proposed pipeline, thereby diluting radon concentrations in any one source of supply. Also, indoor radon concentrations can be expected to be reduced as a result of improved indoor ventilation; the increased energy efficiency of modern boilers, furnaces, and hot water heaters; and new building codes that require venting of gas-fired stoves and ovens. The Commission has no regulatory authority to set, monitor, or respond to indoor radon levels – local, state, and federal entities establish and enforce radon exposure standards for indoor air. We expect the combustion of gas transported by the proposed NJ-NY Project to comply with all applicable air emission standards.

### g.    Noise

83.    Comments object to noise associated with construction, particularly with the 18th Street/Long Slip and Hudson River HDDs. We note the applicants' measurement of the ambient/background sound levels at the noise sensitive area (NSA) nearest to the 18th Street/Long Slip and Hudson River HDD sites show existing levels that exceed our noise limit and state and local noise limits.[60] While HDD activities will add to the current noise level, the mitigation measures we impose will keep the noise associated with the HDD within our noise limit. Thus, we agree with the finding in the EIS that the designated mitigation measures should result in noise levels that comply with our standard of a day-night sound level of 55 decibels on the A-weighted scale (dBA) at the

---

[59] The EIS evaluated seven M&R stations. However, the applicants have not requested approval to construct the IMTT M&R station and such authority is not granted in this order.

[60] Texas Eastern's and Algonquin's Application, Resource Report 9, Air and Noise Quality, Appendix 9F, p. 5.

20521-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                    - 30 -

NSA.[61] To ensure our mitigation measures are adequate, Environmental Condition
No. 28 requires Texas Eastern to submit a final copy of its noise mitigation plans prior to
construction, along with the results of its field measurements that demonstrate the
effectiveness of these measures at the 18th Street/Long Slip and Hudson River HDDs.

84.     In addition to the mitigation measures required for HDD activities, we observe
that Environmental Condition Nos. 29 and 30 require the applicants to file the results of
noise surveys that demonstrate compliance with applicable noise standards no later than
60 days after placing the Hanover Compressor Station and the new and modified M&R
stations in service.

### h.      Reliability and Safety

85.     Numerous comments question the safety of the proposed NJ-NY Project. As
described in final EIS section 4.12, Reliability and Safety, the project's facilities would
be designed, constructed, operated, and maintained to meet the DOT Minimum Federal
Safety Standards set forth in 49 C.F.R. Part 192 and in other applicable federal and state
regulations.

86.     Texas Eastern plans to put in place several measures that exceed DOT's
requirements, including the installation of an additional mainline valve in Jersey City,
and designing the entire 42-inch- and 30-inch-diameter pipelines in accordance with the
Class 3 and Class 4 standards, respectively. The higher class standard reflects the wall
thickness of the pipe, which is increased in direct correlation with an increase in
concentration of the surrounding population. As described in final EIS section 4.12.1,
Texas Eastern would employ thicker-walled pipe than DOT requires along more than half
of the route; this creates a significant safety advantage by increasing the robustness of the
pipe structure.

87.     During operation, the new pipeline would be inspected by the applicants, in
accordance with DOT standards, to observe right-of-way conditions to identify soil
erosion that may expose the pipeline; unauthorized encroachment on the right-of-way,
such as buildings and other substantial structures; and any other conditions that could
present a safety hazard or require preventive maintenance or repairs. Texas Eastern and
Algonquin would also perform integrity risk assessments of the project facilities in order
to monitor for leaks and reduce the possibility of a pipeline failure. The applicants'
representatives would meet with the emergency services departments of the
municipalities and counties along the route of the proposed project on an ongoing basis as

---

[61] Final EIS, pp. 4-230 to -232. We observe that where the Commission's noise
standards are inconsistent with state and local noise regulations, the Commission will
require compliance solely with our standards.

521-3046 FERC PDF (Unofficial) 05/21/2012

part of its liaison program. The liaison program would identify the appropriate fire, police, and public officials, and the responsibilities of each organization that may respond to a gas pipeline emergency, so as to coordinate mutual assistance in responding to emergencies.

### 3.  Late Comments

88.    We received comments too late to be addressed in the final EIS from the Port Authority; Chevron; Sierra Club, Food & Water Watch, and No Gas Pipeline; the New Jersey State Historic Preservation Office (SHPO); Evelyn Preuss; Larry Frenkel; Timothea E. Gabriez; Jordan Davis; Julie Vanderlee; Donna Coppola; Johnny Levano; Darius Filak; Monica Filack; Ashley Kirimdar; Brian Kirimdar; Dale H. Smith; Marlene K. Smith, and Patricia Friedland.[62]

89.    The Port Authority reiterated its previously stated concerns regarding potential construction impacts on the Goethals Bridge Replacement, the Howland Hook/Port Ivory Site, Bayonne Bridge, the Bayonne Local Redevelopment Authority Property, Greenville Yards, and Port Authority Trans-Hudson Jersey City yards. Staff met with the Port Authority during the pre-filing process and considered multiple routing solutions for the specified properties, and final EIS sections 3.4.1, 3.5.1, 3.5.2, 3.5.3, 3.5.4, 3.6.1, 3.6.2, and 3.7.1 evaluate possible routing alternatives for each of the properties. The Port Authority has recently stated that as a result of ongoing discussions with the applicants, their concerns related to the Bayonne Bridge and most of the other alignment issues have been resolved, and they are confident the remaining issues will be resolved. We note that minor route variations are contemplated and authorized by Environmental Condition No. 5, which provides for additional changes on individual properties if the applicants and landowners agree and no sensitive environmental areas are affected.

90.    Texas Eastern proposed a route change for the Goethals Bridge HDD crossing after the draft EIS was issued, and the Port Authority subsequently expressed concern with this modification. After further evaluation, staff determined that Texas Eastern's proposal (Route Variation 74) was not preferable to the route described in the draft EIS.[63] Accordingly, Environmental Condition No. 13 requires that Texas Eastern utilize the route shown in the draft EIS for the Goethals Bridge HDD.

---

[62] These late comments include Chevron's request for, and comments in support of, a technical conference. As discussed above, we deny Chevron's request. As discussed below, we address the environmental concerned raised in the late comments.

[63] Final EIS section 3.6.2.3 and p. 4-141.

91.     Chevron is worried that the pipeline crossing its property in Bayonne could affect the integrity of the protective slurry wall along the Kill Van Kull, potentially causing the re-contamination of previously remediated areas, delaying future remediation efforts on the property, and interfering with planned redevelopment. Commission staff met with representatives of Chevron and Kaplan, LLC (Kaplan)[64] at the applicant's Bayonne open house meeting on June 21, 2010, and received comments from Chevron at the Commission's Bayonne scoping meeting on August 2, 2010, and at the Commission's Bayonne comment meeting on October 18, 2011. The final EIS discusses Chevron's concerns and analyzes the issues associated with potential construction impacts on the property.[65]

92.     Final EIS sections 3.5.1.1, Texas Properties Alternatives, and 3.5.1.2, 1st Street Alternatives, provide extensive analyses of the alternative routing possibilities on and near Chevron's property. Final EIS section 3.6.1.4, Chevron Alternative, evaluates the route alternative Chevron requests in its response to the draft EIS. The alternative route was considered, but rejected after further analysis indicated it would create greater environmental impacts than the proposed route.

93.     Final EIS section 4.8.3.2, Planned Developments, discusses Chevron's concerns with the protective slurry wall, the spread of contamination, and remediation efforts. Environmental Condition No. 20 requires that construction at the Chevron property cannot start until a site-specific plan has been filed for review and approval by the Director of OEP. This conditions should ensure that Texas Eastern's proposed avoidance and minimization measures will be sufficient to satisfy Chevron's concerns.

94.     Final EIS section 4.8.3.2 also discusses Chevron's concerns with the planned redevelopment of its property. Kaplan's development plans indicate the proposed pipeline would pass close to planned residential properties, but would not be incompatible with their anticipated locations. The 50-foot-wide permanent right-of-way – 25 feet either side of the center of the pipeline – would be within 50 feet of several planned residential buildings, a placement permitted by our siting criteria. The installation of the pipeline would not preclude future development, residential or otherwise, from being located along the edge of the permanent right-of-way. We find that with the implementation of the site-specific plan and continued coordination with the

---

[64] Kaplan proposes to redevelop the Chevron property as a mixed-use waterfront community consisting of residential housing, commercial businesses, parks, and transportation facilities.

[65] Chevron sought delay of the final EIS to discuss site-specific property issues in more detail with Commission. We elected not to delay the final EIS, finding that Chevron has already adequately communicated its concerns.

-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                                                          - 33 -

landowner, construction and operation would not create significant adverse impacts on Chevron's property.

95.     Algonquin proposes to add a new M&R station at the existing Ramapo M&R Station. As discussed in final EIS section 2.2.4, Access Roads, the existing road to the station is not suitable for use during construction.[66] Consequently, Algonquin plans to build a temporary access road, with a temporary bridge across the Mahwah River, and route construction traffic over these temporary facilities until installation of the new M&R station is complete. Evelyn Preuss and Larry Frenkel seek to ensure that Algonquin will have reliable access to its new M&R station. They assert that the existing route to the Ramapo station is subject to flooding, and request the temporary bridge and road Algonquin plans to install be made permanent to enable Algonquin to reach its M&R station if the existing route is under water. The final EIS and the COE evaluated the affects to the Mahwah River due to the temporary construction impacts and determined that the river banks must be restored to pre-existing conditions after construction. Making the temporary Mahwah bridge crossing permanent would be inconsistent with this determination that the river banks must be restored. Therefore, we do not see an environmental advantage to changing the established access route to the Ramapo M&R Station.

96.     Ms. Preuss states that she was not privy to information during the Commission's review of the proposed project. We find the public had adequate access to information concerning the proposal and adequate means to comment on it. Final EIS section 1.3, Public Review and Comment, provides extensive details on the opportunities available to the public to participate in the evaluation of the proposed project. Ms. Preuss and her husband, Christopher Harrison, have been on the environmental mailing list since staff's first environmental correspondence was mailed in July 2010. We have accepted all of Ms. Pruess' submissions, whether presented on time or out-of-time, and have taken into consideration the concerns described therein. Accordingly, we find no indication that Ms. Preuss was deprived of access to information or excluded from expressing her concerns.

---

[66] Current access to the Ramapo M&R station is over a private road, which Algonquin is permitted to use for normal operations. The private road's owners object to using the road for construction traffic, due to the higher volume of heavy vehicles that would need to ravel the road and the road's proximity to a children's play area. The private access road is the subject of a proceeding currently before the New York State Supreme Court in *Millennium Pipeline Company, LLC and Algonquin Gas Transmission, LLC v. Christopher S. Harrison and Evelyn Preuss a/k/a Evelyn Preuss Harrison,* Supreme Court of the State of New York, County of Rockland; Index No. 30246/12.

Docket No.CP11-56-000                                                           - 34 -

97.     The New Jersey SHPO disagrees with the applicants' assessment of the
archaeological identification survey for tract number 20-12 and requests additional work
to determine the eligibility of this site. Staff also requested additional information on this
site. To ensure compliance with the National Historic Preservation Act (NHPA),
Environmental Condition No. 26 requires that prior to initiating construction that could
affect cultural resources, the applicants must complete and file all cultural resources
survey reports and plans for the Commission's review. Only after the Commission
completes its responsibilities under the NHPA and approves these reports and plans can
construction be initiated.

98.     Timothea E. Gabriez, Johnny Levano, Darius Filak, Monica Filack, Ashley
Kirimdar, Brian Kirimdar, Dale H. Smith, and Marlene K. Smith filed petitions opposing
the NJ-NY Project; these petitions are identical to petitions previously received in
response to the draft EIS. The objections raised in these petitions are addressed in the
final EIS, Volume II, under IND171 – Form Letter 2.

99.     Ms. Preuss, Jordan Davis, Julie Vanderlee, and Donna Coppola express concerns
with safety aspects of the proposed project. The North Shore Waterfront Conservancy of
Staten Island (NSWC) is concerned about potential damage to Staten Island communities
that might result from any pipeline rupture and gas ignition. As discussed in final EIS
section 4.12.1, Safety Standards, and in Volume II,[67] the proposed pipeline and
aboveground facilities would be designed, constructed, operated, and maintained to meet
DOT safety standards and in compliance with other applicable federal and state
regulations. Further, Texas Eastern has committed to design more than half of its
proposed pipeline to exceed DOT's requirements.

100.    Jordan Davis is concerned with impacts on riparian and aquatic resources in the
Hudson River. As discussed in final EIS section 4.6.2, Aquatic Resources, Texas Eastern
is proposing to implement various mitigation measures (e.g., using a closed
environmental bucket, installing sheet piling and silt curtains, and restricting sediment-
disturbing activities to certain months) to minimize construction impacts in the Hudson
River. We believe that with implementation of these measures, no significant adverse
impacts on riparian and aquatic resources would result from the project.

101.    Donna Coppola commented that the proposed project would adversely impact the
preservation of land and wildlife, and water and air quality. We concur with the
determination in the final EIS in sections 4.6, 4.8, and 4.11.1, that the impacts on these
resource areas would be temporary and minimized by the applicants' adherence to their
Erosion and Sedimentation Control Plan; Excavation Management Plan; Wetland

---

[67] *See, e.g.,* Public Meeting Comments, PM1-7, at II-15 and PM3-27, p. II-112;
Individual Comments, IND86-1, at II-939.

Case 1:12-cv-03159-KAM-RER   Document 1   Filed 06/25/12   Page 44 of 78 PageID #: 44

Restoration Procedures, Best Drilling Practices, Monitoring and Clean-up of Horizontal Directional Drilling Inadvertent Returns; and Spill Prevention Control and Countermeasure Plan/Preparedness, Prevention, and Contingency Plan.

102.   Mr. Davis, Ms. Coppola, and Julie Vanderlee express a preference for the use of renewable energy rather than natural gas.  Final EIS section 3.1.2.3, Renewable Energy, discusses numerous renewable energy sources and technologies.  We acknowledge the virtues that commentors attribute to renewable energy supplies.  However, we affirm the conclusion in the final EIS that reliance on renewable energy would not be a viable alternative to the NJ-NY Project, since renewable projects under consideration would not provide reliable supplies of cost-competitive energy capable of replacing the nonrenewable sources that are needed now to satisfy consumers' overall electricity and residential heating demands.

103.   Mr. Davis objects to the development of natural gas production fields in the Marcellus shale.  As discussed in final EIS sections 1.3 and 4.13 – summarized above – because the sources of gas that might supply this project are so numerous and so varied, and because gas production and gathering are beyond our jurisdictional reach, the potential impact of extracting gas from shale formations is outside the scope of our environmental review.  State and local agencies – e.g., the Pennsylvania Department of Environmental Protection and the New York State Department of Environmental Conservation – have jurisdiction over, and possess a more thorough and detailed knowledge base regarding, the impacts of gas exploration, production, gathering, and intrastate transportation.  Furthermore, we believe that it would be inappropriate for us to exercise or condition our authority over the construction of any jurisdictional pipeline facilities in a manner that would have the result of substituting the Commission's judgment for state or local agencies' own regulatory actions.

## 4.     Comments Received in Response to the Final EIS

104.   In response to the final EIS, we received comments from NSWC, Newport, Jersey City, John Papandrea, Lisa Harrison, Jennifer Lahey, Amy Cherry, Gerrit Crouse, Clare Donohue on behalf of Sane Energy Project, Marina Gutierrez, Carol Flamm Reingold, Suzanne Clare, Elliot Figman, Peter Hudiburg, Jason Rosenfeld, Marion Stein, Erika Chamberlin, Eve Sicular, Phyllis Rosenblatt, Alice Zinnes, Karen Fitzgerald, Edith Kantrowitz, Susan Herzog, Eileen Stukane, Elvin Montero, Meredith Dillon, Julianne Sullivan, Myra Malkin, Lou Katogir, Stephanie Low, Horace Albaugh, Lisa Harrison, and Nancy Kent.[68]  To the extent we have not already responded to the issues raised in these most recent round of comments, we discuss these commentors' concerns below.

---

[68] In addition, we note the applicants have filed additional correspondence and documentation of consultation with the New Jersey SHPO, New York SHPO, Indian

(continued ...)

21-3046 FERC PDF (Unofficial) 05/21/2012

105. NSWC maintains that since the comment period on the draft EIS closed, the shortnose and Atlantic sturgeon have been federally listed as endangered. Final EIS section 4.7.2 acknowledges this, and identifies these two fish as federally listed endangered species and state listed species of concern. The final EIS concludes that construction and operation of the NJ-NY Project would not likely adversely affect the shortnose or Atlantic sturgeon. To ensure we received concurrence with our determination of effect on the two species prior to construction in the Hudson River, final EIS Recommendation 20 required that construction activities in the Hudson River could not begin until consultation with NOAA Fisheries is completed. In a letter dated May 8, 2012, NOAA Fisheries completed ESA section 7 consultation and concurred with the determinations of the final EIS.

106. NSWC is concerned that although fish caught off the northern shores of Staten Island should not be consumed, people nevertheless do so. NSWC asks the Commission and the applicants to act to protect people from consuming contaminated fish, particularly during the dredging portion of the construction process. While we acknowledge there is existing contamination,[69] we stress that our authorization or denial of this application should have no effect on whether individual fish in this area or on the quality of fish caught in this area. Because we do not foresee any potential project impacts on fish contamination or consumption, we find no cause to take any action.

107. We note the final EIS reviewed potential impacts of the proposed project on commercial and recreational fishing in the vicinity of the proposed project. The final EIS section 4.6.2.2, Fisheries of Special Concern, found that current conditions and declines in local fish populations have resulted in the closure of many commercial fisheries and a reduction in recreational fishing for a number of species in the vicinity of the proposed pipeline.[70] To protect fish habitat in the vicinity of the proposed pipeline, we impose certain conditions, such as practices to minimize the release and dispersal of sediments

---

Tribes, and other consulting parties. They have also filed technical proposals for additional archaeological surveys to be conducted in the proposed NJ-NY Project area; updated maps identifying archaeological sites along the pipeline route; and responses to Chevron and Ms. Preuss.

[69] See Table 4.3.2-1, pp. 4-34 to -35 in the final EIS. See also Final New York State 2010 Section 303(d) List of Impaired/TMDL Waters (June 2010) (http://www.dec.ny.gov/chemical/31290.html) which identifies Kill Van Kull as impaired for fish consumption due to PCBs, other toxins, cadmium, and dioxin, with the source listed as contaminated sediments. The 2012 draft of this list also identifies Kill Van Kull as impaired.

[70] See final EIS section 4.6.2.2, Fisheries of Special Concern.

1-3046 FERC PDF (Unofficial) 05/21/2012

during dredging.[71] We find that provided the project is constructed and operated in accordance with the required mitigation measures, it would not materially alter the existing levels of contamination in fish.

108.   NSWC objects to the pipeline's proximity to the Mariners Harbor and Arlington residential communities and the Mariner's Marsh Park.[72] Final EIS sections 3.4.4.4, Mariners Marsh Variation, and 3.6.1.2, Mariners Marsh HDD and Texas Eastern Right-of-Way Alternatives, evaluate the alternative routing possibilities of the pipeline. Final EIS section 4.8.5, Recreation and Special Interest Areas, evaluates the land use concerns associated with Staten Island communities. Texas Eastern plans to install a 0.7- mile-long segment of its pipeline in the road right-of-way, adjacent to Western Avenue and within the Richmond Terrace roadway through industrial and undeveloped areas in Staten Island. The Mariners Harbor and Arlington residential communities are located to the south of Richmond Terrace and south and east of the pipeline route. At its nearest point to these communities, the pipeline would be located about 550 feet north of these communities and more than 40 feet below the ground, and would be installed using the HDD method. In view of the use of HDD, and safety measures imposed upon the pipeline's construction and maintenance, we do not expect the pipeline to impose any unacceptable adverse impacts on the residential communities and the park.

109.   NSWC asks that the applicants be obliged to sponsor a "Community Give Back Program," which NSWC characterizes as "environmental and social justice compensation." NSWC envisions this as a program to fund local minority businesses and industries; low and medium income students' schooling expenses; school improvements; undergraduate and graduate scholarships for 500 students; a minimum of $8 million for clean up, remediation, maintenance, and upkeep of Arlington Marsh and Mariners Marsh Park; and also as a source of funding for other community projects. Final EIS section 4.9.8, Environmental Justice, identified low and minority communities that lie along the proposed path of the pipeline, which include the community NSWC represents, and considered the impacts the proposed project could have on these communities. We conclude that the project will not result in disproportionately high and adverse human health or environmental effects on these communities. Accordingly, there is no cause to

---

[71] See final EIS, sections 4.6.2.3, General Impacts and Mitigation; 4.6.2.4, Site-Specific Impacts and Mitigation; and 4.6.2.6, Essential Fish Habitat final EIS, p. 4-88. For example, to minimize the impacts of in-water work on commercial fisheries, Texas Eastern will avoid sediment-disturbing activities in the Hudson River between February 1 and June 1.

[72] We note that Mariners Marsh Park is currently fenced, with posted signs stating public access is prohibited, and although there is a proposal to establish baseball fields within the park in the future, there is no established timeline for this development.

contemplate mitigation that might include measures such as those in the proposed
Community Give Back Program. Therefore, while the applicants may elect to make
contributions to communities, we have no reason to direct them to do so.

110.   Newport claims the final EIS is legally insufficient because it does not
acknowledge that a permanent pipeline right-of-way would cross its property in the
Hudson River. Newport asserts that the applicants initially sought only a temporary
workspace on its property, and represented to Newport and the Commission that the path
of its pipeline would not permanently occupy any surface or subsurface of Newport's
property. Newport interprets a March 28, 2012 letter it received from the applicants[73] as
indicating the applicants' intent to locate a portion of the underwater path of the pipeline
on Newport's offshore property, necessitating a permanent easement. Newport argues
this placement of the pipeline contradicts the applicants' early and repeated assurances
that the project would not permanently occupy any Newport property. Newport points
out that Commission staff, in assessing the project, similarly relied on the applicants'
assurances, with both the draft and final EIS declaring that "none of the pipeline would
cross Newport Development's property."[74]

111.   Newport accurately describes the applicants' assurances regarding the planned
pipeline route. Whether Newport accurately describes the March 28, 2012 letter as
inconsistent with the claim that none of the pipeline would cross Newport's property is
unclear. Clearly, Newport and the applicants differ in their views of the intent of the
March 28, 2012 letter. The March 28, 2012 letter contains a Grant of Temporary
Easement agreement, which offers Newport compensation for a temporary easement, and
describes in detail the intended path of the pipeline and the workspace the applicants seek
to use during its construction. Newport believes the described route will place the
pipeline not adjacent to its property line, as it had anticipated, but on the other side of it,
and thus necessitate not a temporary workspace easement but a permanent easement.

112.   The March 28, 2012 letter does not propose to alter the route of the pipeline as set
forth in the final EIS. Consequently, we do not view the letter's description of the
placement of the pipeline as rendering the final EIS legally insufficient. Newport
characterizes the need for a permanent easement as a material change to the proposed
project which requires a supplemental environmental review. A supplemental
environmental review may be undertaken if there are: (1) substantial changes in the

_____

[73] See Newport's Comments on the Final EIS, Motion for EIS Supplementation,
and Protest of Certificate Issuance, Exhibit 3 (April 9, 2012).

[74] Draft EIS, section 3.17, Hudson River HDD Pipeline Fabrication Alternative, at
p. 3-115 and final EIS, section 3.8.2, Hudson River HDD Pipeline Fabrication
Alternative, at 3-175.

proposed project that are relevant to environmental concerns; or (2) significant new circumstances or information relevant to environmental concerns and bearing on the proposed project or its impacts.[75] Here, while Newport may view a permanent rather than a temporary easement as a material impact on Newport, we do not view it as a substantial change to the project or as significant new information. The route of the pipeline under the river remains as described in the final EIS. A change in where the pipeline will be located could impact the results of our environmental review, but a change in our identification of the owners of the underwater properties along the path of the pipeline has no bearing on the determinations reached in our environmental review. Accordingly, we find no cause for any additional review.

113.    Newport stresses that placing the pipeline on its property would be inconsistent with the Jersey City Redevelopment Agency's permitted use of Newport's property. We urge Jersey City, the applicants, and Newport to consider whether the manner of construction and operation of the pipeline can be made to comply with local regulations. While we encourage cooperation between project applicants and local authorities, we note that any state or local permits affecting the NJ-NY Project facilities must be consistent with the conditions of the applicants' certificate authorization.

114.    Newport argues a permanent easement would impose constraints on the current and future use of its property. The applicants must compensate Newport, as well as all other landowners, for any constraints an easement may impose on a property's current and future use. Determining compensation for necessary rights-of-way is a matter for negotiation, and if negotiations are not successful, the appropriate forum for establishing compensation is in court.[76] The Commission plays no part in this determination.

115.    Newport maintains that as an affected landowner, it failed to receive adequate notice of the proposed project. We find Newport was fully informed of the proposed project, both during the prefiling process and after the application was filed. From the beginning, the Commission has included Newport on its list of interested persons to be informed of developments in this proceeding, Newport has attended every public meeting, and Newport has submitted a series of comments that track the evolution of our evaluation of the application in this proceeding. Accordingly, we find Newport has had adequate opportunity to make its concerns known, and has done so.

[75] See 40 C.F.R. § 1502.9(c) (2011).

[76] Specifically, in a district court of the United States in the district in which the property is located or in a state court, provided the amount claimed does not exceed $3,000. See NGA section 7(h). The same process for determining compensation applies to all owners of property rights necessary for the construction and operation of the NJ-NY Project.

ERER Case 1:12-cv-03159-KAM-RER   Document 1   Filed 06/25/12   Page 49 of 78 PageID #: 49

116. Newport complains that the final EIS did not take into account the issues it presented in its December 19, 2011 sixth comment letter. Newport's sixth comment letter did not present any substantive new noise matter that was not already raised in its five prior comment letters. In its sixth comment letter, Newport reiterates objections to the noise that the proposed project's construction would create. Although the final EIS did not refer to Newport's sixth comment letter by name, the issues identified in that letter, which had been introduced by Newport in its earlier comment letters (and were also articulated by other commentors), were taken into consideration and addressed in the final EIS. The issues restated by Newport in its sixth comment letter are discussed in final EIS sections 4.8.3.2, Planned Developments, and 4.11.2.3, Noise Level Impacts and Mitigation.

117. Newport argues the proposed project should be subject to state and local noise regulations, including certain regulations that prohibit nighttime construction noise. To ensure compliance, Newport suggests revisions to Texas Eastern's 18th Street/Long Slip and Hudson River Horizontal Directional Drill Noise Mitigation and Noise Monitoring Plan. Final EIS section 4.11.2.2, Noise Regulatory Requirements, summarizes the applicable state and local noise regulations, and notes Texas Eastern's expectation that it will be able to comply with these regulations, with the exception of those that ban construction during nighttime hours.

118. A ban on nighttime construction would conflict with certain activities that are scheduled to continue around the clock, such as the 18th Street/Long Slip and Hudson River HDD crossings. We find this to be a prudent approach, because it has been our experience that the continuous operation of drilling equipment is necessary to successfully install pipe using the HDD method. We expect the duration of these round-the-clock activities to be relatively short. More to the point, we expect the mitigation measures we require will hold noise within our threshold of 55 dBA $L_{dn}$ at NSAs for all project-related construction activities.

119. Newport maintains the final EIS failed to include Newport Park as a recreational area within 0.25 miles of the pipeline route. Although this park is still under development, Newport expects it to open prior to the completion of construction and contends that ongoing construction could adversely impact users of the park. Newport contends the park should have been recognized as an NSA subject to the Commission's 55 dBA noise limit. Newport similarly claims that noise level will exceed 55 dBA at the Hudson River Waterfront Walkway.

120. Parks are neither classified as NSAs subject to the 55 dBA limit nor treated as such; nevertheless, Texas Eastern has proposed a noise mitigation and noise monitoring plan for the east end of the 18th Street/Long Slip HDD and the west end of the Hudson River HDD that would decrease construction noise within the park. We expect impacts

1-3046 FERC PDF (Unofficial) 05/21/2012

on this park to be similar to those in other nearby recreational areas.[77] These impacts would be temporary and limited to the period of active construction. Texas Eastern's ambient noise survey identified the background noise at NSAs near the park as currently exceeding 55 dBA.[78] Construction noise during daytime hours, when the park presumably would be predominantly used, is not expected to significantly increase the ambient noise level. We accept the approach as a reasonable response to Newport's concerns.

121.    Jersey City is dissatisfied with PHMSA's current Class Location system, whereby PHMSA distinguishes segments along a gas pipeline based on the nearby population, and applies more stringent standards to more densely populated segments.[79] Jersey City believes PHMSA should add three new categories to its Class Location system to better distinguish high-density urban areas, and apply even more stringent standards to these locations. Jersey City states that on March 15, 2012, it petitioned PHMSA to initiate a rulemaking to put these regulatory revisions into effect, and asks the Commission to hold this proceeding in abeyance until PHMSA acts on its request.

122.    PHMSA's regulations, like the Commission's, are subject to continual review and revision to keep pace with developments in the industry and market. That said, in considering an application or other action, we apply those regulations that are currently in effect. Jersey City's petition to PHMSA, has no bearing on our assessment of the proposed project. In addition, as discussed above, not only will the proposed project meet PHMSA's current Class Location safety standards, portions of the pipeline will exceed these standards. We note that the NJ-NY Project facilities will have to comply with any stricter standards that PHMSA may elect to impose on the authorized facilities

---

[77] *See* final EIS section 4.8.5, Recreation and Special Interest Areas. As explained in the final EIS at p. 4-231, with respect to the Hudson River Waterfront Walkway, "we do not consider the walkway to be a NSA subject to [the] 55 dBA noise standard since it is used by a transient population that would only experience the noise impact for a brief period of time." Thus, our project authorization permits construction activities that exceed the 55 dBA standard at the walkway and at parks.

[78] The applicants' measurement of the ambient/background sound levels at NSAs nearest to the 18th Street/Long Slip and Hudson River HDD sites show existing levels that exceed our noise limits as well as state and local noise limits. *See* Texas Eastern's and Algonquin's Application, Resource Report 9, Appendix 9F, p. 5. While HDD activities will add to the current noise level, we anticipate the applicants' implementation of the required noise mitigation measures will bring the overall noise level down and into compliance with our noise limits.

[79] *See* 49 C.F.R. § 192.5 (2011).

621-3046 FERC PDF (Unofficial) 05/21/2012

Docket No. CP11-56-000                                                    - 42 -

in the future. In view of this, we reject Jersey City's request that we delay our decision in this proceeding.

### E.    Conclusion

123.    We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the project. Based on our consideration of this information and the discussion above, we agree with the conclusions presented in the final EIS and find that the proposed NJ-NY Project, if constructed and operated as described in the final EIS and the application, as supplemented, is an environmentally acceptable action. We adopt the environmental recommendations in the final EIS and include them as conditions of our certificate authorization of this project.[80]

124.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of the certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[81]

125.    Texas Eastern or Algonquin shall notify the Commission's environmental staff by telephone or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Texas Eastern or Algonquin. Texas Eastern or Algonquin shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

126.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application and exhibits thereto, as supplemented, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

    (A)    Certificates of public convenience and necessity are issued to Texas Eastern and to Algonquin, authorizing the construction and operation of the NJ-NY Project

---

[80] These environmental conditions are specified in Appendix B of this order.

[81] *See, e.g., Schneidewind v. ANR Pipeline Company*, 485 U.S. 293 (1988); *National Fuel Gas Supply v. Public Service Commission*, 894 F.2d 571 (2d Cir. 1990); and *Iroquois Gas Transmission System, L.P.*, 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                    - 43 -

facilities, as more fully described in the application, as supplemented, and in the body of
this order.

     (B)     A certificate of public convenience and necessity is issued to Texas
Eastern, authorizing it to acquire 730,000 Dth/d of firm transportation capacity, from the
Lease Receipt Points to the Lease Delivery Point, on Algonquin's facilities, by lease for a
20-year term, as more fully described in the application, as supplemented, and in the
body of this order.

     (C)     Permission and approval are granted for Algonquin to abandon 730,000
Dth/d of firm transportation capacity, from the Lease Receipt Points to the Lease
Delivery Point, by lease to Texas Eastern for a 20-year term, as more fully described in
the application, as supplemented, and in the body of this order.

     (D)     Permission and approval are granted for Texas Eastern to abandon certain
facilities by removal and abandon other facilities in place, as more fully described in the
application, as supplemented, and in the body of this order.

     (E)     Prior to commencement of construction, Texas Eastern must execute
contracts for service at levels and under terms and conditions equivalent to those which it
represented was subscribed under precedent agreements.

     (F)     Texas Eastern shall notify the Commission within 10 days of the effective
dates of the abandonments approved in Ordering Paragraph (D).

     (G)     Texas Eastern and Algonquin must construct and make available for service
the facilities described herein by November 1, 2013.

     (H)     Texas Eastern's request for authority to charge an incremental rate for firm
service under proposed Rate Scheduler FT-1 on the NJ-NY Project is approved. Texas
Eastern's proposal to charge an incremental rate for interruptible service on the NJ-NY
Project and its proposed Rate Schedule IT are rejected. Texas Eastern may propose to
establish a separate rate zone with incremental firm and interruptible rates for the 15.2-
mile extension in its compliance filing.

     (I)     Texas Eastern shall file actual tariff records with the incremental rates and
changes to its rates and tariff as directed herein no earlier than 90 days, and no later than
30 days, prior to the date the NJ-NY Project facilities go into service.

     (J)     Texas Eastern shall file its negotiated rate agreements or a tariff record
describing the negotiated rate agreements no earlier than 60 days, and no later than 30
days, prior to the NJ-NY Project facilities going into service.

046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                    - 44 -

     (K)    Texas Eastern shall file an executed copy of each non-conforming agreement reflecting the non-conforming language and a tariff record identifying these agreements as non-conforming agreements no earlier than 60 days, and no later than 30 days, prior to the NJ-NY Project facilities going into service.

     (L)    Texas Eastern must comply with the accounting requirements set forth in this order.

     (M)    Texas Eastern and Algonquin must comply with the environmental conditions set forth in Appendix B of this order and all regulations under the NGA including, but not limited to, Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations.

     (N)    Texas Eastern or Algonquin shall notify the Commission's environmental staff by telephone, e-mail, and/or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Texas Eastern or Algonquin. Texas Eastern or Algonquin shall file written confirmation of such notification with the Secretary of the Commission (Secretary) within 24 hours.

     (O)    The request for the Commission to convene a technical conference is denied.

     (P)    The untimely motions to intervene are granted.

     (Q)    The motions to hold the proceedings in abeyance are denied.

By the Commission.

( S E A L )

                             Nathaniel J. Davis, Sr.,
                             Deputy Secretary.

21-3046 FERC PDF (Unofficial) 05/21/2012

## Appendix A

### Intervenors

*Timely, Unopposed Motions to Intervene*

20-26 North Moore Street Corp.
Aaron C. Dodd
Aaron S. Eckenthal
Abhishek Mathur
Achal Agarwal
Addie Kong
Aimee M. Seungdamrong
Alessandra Rafferty
Alexander Kratkov
Alfred C. Martino
Alice Elman
Allyson Johnson
Althea Bernheim
Amy L. Coplan
Amy Landau
Anadarko Energy Services Company
Anahi T. Galante
Andrea H. Gaines
Andrew Boyar
Andrew Brook
Andrew C. Jennings
Andrew Cooper
Andrew Solodsky
Andrew V. Luck
Andrew W. Chatterton
Andrew Yeung
Angela Manno
Angelo Oddo
Ann C. Seligman
Ann Ellis
Anna Mylonas Christodoulakis
Anthony Macagnone
Apurva Shah
Aravind Gadhiraju
Arden Down
Ari M. Kamen
Mrs. Aaron Morrill

3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                          - 46 -

Ashleigh Copeland
Atmos Energy Corporation
Atmos Energy Marketing LLC
Becky Hoffman
Benedetta Barnabo Cachola
Bess P. Morrison
Bette A. Druck
Betzy E. Parks
Beverley E. Birks
Bridget Fujioka
Bryant Lee
C. Michael Norton
Calpine Energy Services, L.P.
Carolina Power & Light Company, d/b/a Progress Energy Carolinas, Inc.
Carrie Craft
Catherine Jennings
Charles A. Gallagher
Charles R. Agle
Charlie Olson
Chesapeake Energy Marketing, Inc.
Chipo Sachirarwe
Chris Chang
Chris Condon
Christine C. Quinn
Christine Heun
Christoph Nierth
Christopher Burt
Clara Richardson
Clarissa Hay
Consolidated Edison Company of New York, Inc. and Orange and Rockland Utilities,
Inc.
Cynthia V. Bryant
Dalia Tole
Dan Totilca
Daniel A. Nole, Jr.
Daniel E. Kowalski
Daniela Ciammaruconi
David C. Publow
David E. Conrad
David Gong
David J. Braun
David Stanke

46 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                    - 47 -

Debbie Walters
Deborah H. Schenk
Deborah Sinico
Debra A. Italiano
Debra Lumen
Deirdre E. Kennedy
Desdemona Haynes
Dhyana Kluth
Diane Tider
Distrigas of Massachusetts LLC
Divinia Castro
Dominion Transmission, Inc.
Donovan Bezer
Douglas Flores
E. Tan
Eldad S. Tarmu
Elisabeth Welles
Elizabeth Beaver
Ella Lee
Elmer G. Andal
Emily Treganowan
Emmy Hunter
Eric W. Scott
Erin Jurnove
Evelyn F. Moore
Fred Mueller, Jr.
Felicitas Jaima
Francine M. Delgado
Frederick W. Sullivan
Gail Simmons
Garth H. Atchley
Gary E. Brant
Geoffrey M. Elkind
George D. Elenberg
Giovanna Romano
Glen I. Levy
Grace McCusker
Grand Street Realty, L.L.C.
Gregory Tau
Harit Jolly
Heather A. Wightman
Heidi A. Curko
Heidi Short

Docket No.CP11-56-000                                             - 48 -

Holly N. Smith
Howard Singer
Ilene Antelman
Ilona V. Castro
Jack Kupferman
Jamar W. Tyndale
James F. Gennaro
James Wong
Jamie L. Brant
Janet Bosi
Janine M Berger
Janna Passuntino
Jasmine Graf
Jason Kirschner
Jean Palomares
Jeffrey T. Blum
Jennie Broderick
Jennie Santos Gregory
Jersey City Episcopal Community Development Corporation
Jessica McNamara
Jill Greenberg
Jill Wiener
Joanne Hixson
John Billeci
John Hanussak
John Paradiso
Jon Ritzdorf
Jorge Gonzalez
Jose Acosta
Josephine Go
Joshua Fox
Joshua Knechtel
Judith K. Canepa
Julio Ortiz
Jun Yu
Kaplan at Bergen Pointe, LLC
Karee Skarsten
Karin D. Williams
Kathleen Maloy
Kathleen O'Malley
Kathleen V. Gallagher
Kathryn Dyer
Kemi Akinsanya-Rose

1-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                             - 49 -

Ken Goldman
Kerri A. O'Shea
Krishna Dayanidhi
Kristina Woiderski
Kristy A. Cioffi
Laili Kafi
Lashambi B. Moore
Laura R. Sheinkopf
Lauren Naslund
Laurie Spaeth
Lawrence Higgs
Leonard Belzer
Leyana A. Dessauer
Liberty Natural Gas, LLC
Ling Tsou
Lisa Tan
Lonnie Baldwin
Lucy Korn
Luz M Guzman
Marcia Cooper
Margaret Rafferty
Margery Schab
Maria Alvear
Maria Inoa
Mark Fletcher
Mark Gurfinkel
Mark Ruffalo
Mark Spencer
Mark Walters
Marlon Osbourne
Mary Ford
Mary Kate Stillings
Mary Tan
Matthew Brown
Matthew Salerno
Matthew Sun
Matthew Worden
Mav Moorhead
Maxwell Kim
Maya Chafe
McAllister Maritime Holdings, LLC and McAllister Towing of New York, LLC
Meghan M. Van Horn
Melissa LeBoeuf

Docket No.CP11-56-000                                                    - 50 -

Melissa O'Brien
Michael J. Wright
Michael Oakleaf
Michael R. Baumann
Michael R. Galanowsky
Michael S. Schwartz
Michaell D. Harris
Mike Hsu
Miriam Bloom
Mory Thomas
Nancy Wechter
National Fuel Gas Distribution Corporation
National Grid Gas Delivery Companies
Nes Diaz
New England Local Distribution Companies
New Jersey Board of Public Utilities
New Jersey Department of Environmental Protection
New Jersey Natural Gas Company
New York State Public Service Commission
Newport Associates Development Company
Nicole Ortolano
NJR Energy Services Company
Noel Guzman
Nydia Hernandez
Orvil T. Clarke
Owen Crowley
Pamela P Guyot
Patricia Cuddy
Paul Bellan-Boyer
Paul H. Thomas
Paul V. Tagliareni
PECO Energy Company
Peter G. Gagnon
Peter J. Lannigan
Peter Mikail
Peter O'Reilly
Philadelphia Gas Works
Phyliss Erlich Greene
Piedmont Natural Gas Company, Inc.
ProLiance Energy, LLC
PSEG Energy Resources & Trade LLC
Raven R. Pedano
Ravin Patel

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                          - 51 -

Richard H. Leehr
Richard L. Williams
Richard Satkin
Robert Fornes
Robert M. Pienciak
Robin Pinkowitz
Rolando R Lavarro, Jr
Ronald G. Morosan
Roseann Palestis-Marrero
Ruth Lesnewski
Ryan Gilbert
Sachin Gupta
Sanjay Coutinho
Sasha Greco
Scott M. Stringer
Scott Sheppard
Seema A. Misra
Shanna K. Moore
Shannon E. Ayala
Sharon Goodman
Sharron Ma
Shuyin Zhang
Simon Ng
Siobhan Nestor
Stanley L. Shih
Statoil Natural Gas LLC
Stephanie Low
Steven Davison
Steven M. Fulop
Sulyn Silbar
Sumeeta A. Gawande
Susan Richards
Susan Santos
Tamara Moise
Tejash Shah
Texaco Downstream Properties Inc.
The Municipal Defense Group
The Urban League of Hudson County
Thomas G. Schultz, Jr.
Thomas P. Noonan
Timekia Carter
Timothy E. Graham
Tom Morse

Docket No.CP11-56-000                                         - 52 -

Tom Scoggan
Tomas K. Liogys
Transcontinental Gas Pipe Line Company, LLC
Valerio Luccio
Vaneet Gupta
Vera Scroggins
Vivian Brady-Phillips
Wayne J. Mitchell
Wesley J. Waldron
William A. Murray
William Elsey
Yoon Choe

*Untimely, Unopposed Motions to Intervene*

Michael Kaplan
Alice Joyce
Amit Desai
Brenda Swinney
Brian L. Kenet
Darcy L. Muckler
Dominador V Pascual, III
Gabrielle Engh
Meredith H. Dillon
Michael DeCorte
Nicole E. Demby
Ramapough Lenape Nation
Repsol Energy North America Corporation
Rizal D Tupaz, Jr.
Sandra Koponen
Sanjana Javadekar
Shaniese Myers
Tiffany Taulton
Tyrone M. Thomas
Vernon Richardson

*Timely Motions to Intervene in Opposition*

Larry Shield
110 Hoboken Avenue Development Urban Renewal Co., LLC
380 Development LLC
4th Street Arts
71 Jefferson Street Condominium Association

3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                              - 53 -

Adam Gilbert
Alan J. Silberman
Alex Veilleux
Alice Zinnes
Andrew H. Burton
Angela Briggins
Anita Margulis
Anna Almquist
Anne Lazarus
Archana Mallajosyula
Armand H Prati, Jr.
BeauArts Ltd.
Benito Solis
Bethe A Schwartz
Carol Lester
Carter Craft
Catalina Aranguren
Catskill Citizens for Safe Energy
Center for Working Families
Chester P Wargocki, Jr.
Christ Hospital
Christina Graziano
Christine N. Cobb
Christopher Buckley
Christopher M. Torres
Christopher Weber
City of Hoboken
City of Jersey City
Civic JC
Clare Donohue
Colleen R. Kirk
Crystal McConnico
Cynthia Bonner
Dana Lee Cohen
Daphney Civil-Acosta
David Bernstein
David Handy
David Silberberg
Debbie A. Davis
Deborah Jindela
Deborah P. Siegel
Debra Coleman
Denise Katzman

3046 FERC PDF (Unofficial) 05/21/2012

Dudley Benoit
Edward Alvarez Eskew
Eileen Judge
Ellen Broudy
Emily A. Kondes
Fernanda P. White
Friends of the High Line
Gail Walden
Gerald M Lyons
Greenpoint Waterfront Association for Parks and Planning
Gusti Bogok
Guy W. Patton
Hamilton Park Condominiums Inc
Harshad Natu
Harsimus Cove Association
Hee Chung Hwang
Hess Corporation
Historic Paulus Hook Association, Inc.
Holly May Smith
Jacek Trzepla
Jaime L. Silver
James P. Dowling
Janice Mayes
Jari Chevalier
Jeffrey P. Smith
Jeffrey Persky
Jennifer R. Davis
Jersey City Medical Center
Jersey City Municipal Utilities Authority
Jersey City Parks Coalition
Jersey City Public School District and Jersey City Board of Education
Jesse Soursourian
Jessica Empestan
Jessica Howse
Jessica Ludwig
Joanna Gajuk
Joanne E. Gifford
Joel Torres
Joi Kelley
Judith A. Karpova
Karen O'Shea
Karla Kirby
Kevin Gorman

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                           - 55 -

Lauren Swaddell
Lisa Blando
Lisa Cabarcos
Lori J Metrulis
Lynda Kozlik
Machi Tantillo
Manhattan Community Board 2
Margaret M. Welch
Margaret Rodriquez
Maria M .Cantwell
Mariah Q. Silva
Maritsa C. Nunziata
Mark DiPaolo
Mark G. Wade
Marlie Wilson
Marvia A. Blake
Mary L. Kulakowski
Meisel Holdings NJ, LLC
Mia Scanga
Michele Al-Kadiri
Michele Massey
New Yorkers for Clean Water Inc.
Nguyet V. Tran
Nick Goldsmith
Nicole Dillingham
Nicole Rehorn
Nisha Ladha
NJ NAACP
nac0889@yahoo.com (email identification, with no name provided)
Nokeima Jones
Notre Dame School of Manhattan
NR Property 20, L.P.
NYH2O
Ozgun Tasdemir
Ozlem Baygun
Pam Shaw
Paul Nugent
Perry Tripp
Peter Wong
Port Authority of New York and New Jersey
Michael J. Darata
Powerhouse Arts District Neighborhood Association
Randolph D. Smith

3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                                                 - 56 -

Rasmin Arbai
Ravi Gudhka
Raymond Testa
Rebecca Shapiro
Renate Evers
ReNew School
Richard H. Wake
Richelle Reyes
Rocio Magana
Saint Joseph Roman Catholic Church
Sara J. Welch
Sean Murphy
Sgt. Anthony Park Association
Sierra Club, Food & Water Watch and No Gas Pipeline
St. Matthew's Evangelical Lutheran Church, Jersey City
St. Paul of the Cross Church
Stacey F. Luftig
Talia Lugacy
Tara Rosen
Terri L. Fountain
The 9th Street Block Association Between Coles & Monmouth
The Ambriola Company, Inc.
The Daylight Gallery
The Friends of Liberty State Park
Beryl Thurman
The Park Slope Food Coop Inc.
The Village Neighborhood Association
Timothy M. DeTraglia
Toby Lenihan Lenihan
Tony Valeri
Town of Rochester, New York
Twanita Bragg
United for Action
V J Delivery Service, Inc.
Valentina Solodskaya
Vanessa Clifford
Veronica Houghtalin
Vincent LaBarbera
Vinit Nagda
Virginia Torres
WA Golf Co, LLC and WA Residential Urban Renewal Company, LLC
Washington Park Association of Hudson County
Wendy Wong-Tsang

Docket No.CP11-56-000                                                    - 57 -

William A. Ferullo
William Moorhead
Working Families Party
Zephyr Lofts Condominium Association, Inc.

*Untimely Motions to Intervene in Opposition*

138 Watts Street Owners Corp.
Adrian J. van Schie
Andrew Persoff
Anjali Oberoi
Audrey W. Hawkins
Cagan Yuksel
Carla G. Kwiatkowski McElroy
Ch Bray
Dianna Guadagnino
Dorothea Izzo
Eliot Figman
Evelyn Preuss
Hamilton Health & Fitness
Jane S. Maisel
Janet Curley
Jerome Wagner
Jersey City Moms Meetup
Jon Wasserman
Kelly P Peral
Kim Youngberg
Lakeland Unitarian Universalist Fellowship
Lisa DiCaprio
Margaret T. Segall
Margaret Wood
Mary H. Reinertsen
Meagan Perry
Michael Crachiolo, Jr
Natalie Cronin
Paul Graham Graham
Richard L. Tschudy
Riverkeeper, Inc.
Sane Energy Project
Sarah Minsloff
Simone Harris
Sivaramya Rajakumar
Steve Zlotnik

FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000

- 58 -

Thomas Angelo
Vineeta Shingal
Wendy S. Kaiser

Docket No.CP11-56-000                                            - 59 -

### Appendix B

**Environmental Conditions**

**New Jersey-New York Expansion Project (NJ-NY Project)**
**Docket No. CP11-56-000**

As recommended in the final Environmental Impact Statement (EIS) and as amended
herein, this authorization includes the following conditions.

1. Texas Eastern Transmission, LP (Texas Eastern) and Algonquin Gas
   Transmission. LLC (Algonquin) (collectively, Applicants) shall follow the
   construction procedures and mitigation measures , and comply with the conditions
   described in theirs application, supplemental filings (including responses to staff
   data requests), and the final EIS, unless modified by this Order.  The Applicants
   must:

   a.  request any modification to these procedures, measures, or conditions in a
       filing with the Secretary;
   b.  justify each modification relative to site-specific conditions;
   c.  explain how that modification provides an equal or greater level of d.
       environmental protection than the original measure; and
   d.  receive approval in writing from the Director of the Office of Energy
       Projects (OEP) **before using that modification.**

2. The Director of OEP has delegated authority to take whatever steps are necessary
   to ensure the protection of all environmental resources during construction and
   operation of the NJ-NY Project and activities associated with abandonment of the
   NJ-NY Project.  This authority shall allow:

   a.  the modification of conditions of the Order; and
   b.  the design and implementation of any additional measures deemed
       necessary (including stop-work authority) to ensure continued compliance
       with the intent of the environmental conditions as well as the avoidance or
       mitigation of adverse environmental impact resulting from NJ-NY Project
       construction, operation, and abandonment activities.

3. **Prior to any construction,** the Applicants shall file with the Secretary an
   affirmative statement, certified by a senior company official, that all company
   personnel, and Environmental Inspector (EI) and contractor personnel will be
   informed of the EI's authority and have been or will be trained on the
   implementation of the environmental mitigation measures appropriate to their jobs
   **before** becoming involved with construction and restoration activities.

Docket No.CP11-56-000                                                     - 60 -

4.      The authorized facility locations shall be as shown in the final EIS, as
        supplemented by filed alignment sheets. **As soon as they are available and
        before the start of construction,** the Applicants shall file with the Secretary any
        revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000
        with station positions for all facilities approved by the Order. All requests for
        modifications of environmental conditions of the Order or site-specific clearances
        must be written and must reference locations designated on these alignment
        maps/sheets.

        The Applicants' exercise of eminent domain authority granted under NGA section
        7(h) in any condemnation proceedings related to the Order must be consistent with
        these authorized facilities and locations. The Applicants' right of eminent domain
        granted under NGA section 7(h) does not authorize it to increase the size of its
        natural gas pipeline to accommodate future needs or to acquire a right-of-way for
        a pipeline to transport a commodity other than natural gas.

5.      The Applicants shall file with the Secretary detailed alignment maps/sheets and
        aerial photographs at a scale not smaller than 1:6,000 identifying all route
        realignments or facility relocations, staging areas, pipe storage and ware yards,
        new access roads, and other areas that will be used or disturbed and have not been
        previously identified in filings. Approval for each of these areas must be
        explicitly requested in writing. For each area, the request must include a
        description of the existing land use/cover type, and documentation of landowner
        approval, and a statement of whether any cultural resources or federally listed
        threatened or endangered species will be affected and whether any other
        environmentally sensitive areas are within or abutting the area. All areas shall be
        clearly identified on the maps/sheets/aerial photographs. Each area must be
        approved in writing by the Director of OEP **before construction in or near that
        area.**

        This requirement does not apply to extra workspace allowed by the Applicants'
        Erosion and Sedimentation Control Plan for the NJ-NY Project, minor field
        realignments per landowner needs, and requirements that do not affect other
        landowners or sensitive environmental areas such as wetlands.

        Examples of alterations requiring approval include all route realignments and
        facility location changes resulting from:
        (i)     implementation of cultural resources mitigation measures;
        (ii)    implementation of endangered, threatened, or special concern species
                mitigation measures;
        (iii)   recommendations by state regulatory authorities; and
        (iv)    agreements with individual landowners that affect other landowners or
                could affect sensitive environmental areas.

-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000                                    - 61 -

6.    **Within 60 days of the acceptance of the Certificate and before construction begins,** the Applicants shall file with the Secretary an Implementation Plan for review and written approval by the Director of OEP. The Applicants must file revisions to the plan as schedules change. The plan shall identify:

   a.    how the Applicants will implement the construction procedures and mitigation measures described in their application, supplemental filings (including responses to staff data requests), the final EIS, and required by the Order;

   b.    how the Applicants will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

   c.    the number of EIs assigned per spread, and how the Applicants will ensure that sufficient personnel are available to implement the environmental mitigation;

   d.    company personnel, including EIs and contractors, who will receive copies of the appropriate material; .

   e.    the location and dates of the environmental compliance training and instructions the Applicants will give to all personnel involved with construction and restoration (initial and refresher training as the NJ-NY Project progresses and personnel changes), with the opportunity for OEP staff to participate in the training session;

   f.    the company personnel (if known) and specific portion of the Applicants' organization having responsibility for compliance;

   g.    the procedures (including use of contract penalties) the Applicants will follow if noncompliance occurs; and

   h.    for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

      (i)    the completion of all required surveys and reports;

      (ii)    the environmental compliance training of onsite personnel;

      (iii)    the start of construction; and

      (iv)    the start and completion of restoration.

7.    The Applicants shall employ one or more EIs per construction spread. The EIs shall be:

   a.    responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

   b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see Environmental Condition No. 6 above) and any other authorizing document;

   c.    empowered to order correction of acts that violate the environmental

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000 - 62 -

conditions of the Order, and any other authorizing document;

d. a full-time position, separate from all other activity inspectors;

e. responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

f. responsible for maintaining status reports.

8. Beginning with the filing of its Implementation Plan, the Applicants shall file with the Secretary updated status reports on a **weekly basis until all construction and restoration activities are complete**. On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

a. an update on the Applicants' efforts to obtain the necessary federal authorizations;

b. the current construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

c. a listing of all problems encountered and each instance of noncompliance observed by any EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d. a description of corrective actions implemented in response to all instances of noncompliance, and their cost;

e. the effectiveness of all corrective actions implemented;

f. a description of any landowner/resident complaints that may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

g. copies of any correspondence received by the Applicants from other federal, state, or local permitting agencies concerning instances of noncompliance, and the Applicants' response.

9. The Applicants shall develop and implement an environmental complaint resolution procedure. The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the NJ-NY Project and restoration of the right-of-way. **Prior to construction**, the Applicants shall mail the environmental complaint resolution procedures to each landowner whose property will be crossed by the NJ-NY Project.

a. In the letter to affected landowners, the Applicants shall:

(i) provide a local contact that the landowners shall call first with their concerns; the letter shall indicate how soon to expect a response;

(ii) instruct the landowners that, if they are not satisfied with the response, they shall call the Applicants' Hotline; the letter shall

1-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000

- 63 -

     indicate how soon to expect a response; and

 (iii)  instruct the landowners that, if they are still not satisfied with the response from the Applicants' Hotline, they shall contact the Commission's Dispute Resolution Service Helpline at 877-337-2237 or at ferc.adr@ferc.gov.

 b.  In addition, the Applicants shall include in their weekly status reports a table that contains the following information for each problem/concern:

  (i)  the identity of the caller and the date of the call;

  (ii)  the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

  (iii)  a description of the problem/concern; and

  (iv)  an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.  **Prior to receiving written authorization from the Director of OEP to commence construction of any NJ-NY Project facilities,** the Applicants shall file with the Secretary documentation that they have received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.  The Applicants must receive written authorization from the Director of OEP **before placing the authorized facilities in service.** Such authorization will only be granted following a determination that rehabilitation and restoration of areas affected by the NJ-NY Project are proceeding satisfactorily.

12.  **Within 30 days of placing the authorized facilities in service,** the Applicants shall file with the Secretary an affirmative statement, certified by a senior company official:

 a.  that the facilities have been constructed and abandoned in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

 b.  identifying which of the Certificate conditions the Applicants have complied or will comply. This statement shall also identify any areas affected by the NJ-NY Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13.  **Prior to construction,** Texas Eastern shall file with the Secretary for review and written approval by the Director of OEP revised alignments sheets utilizing the pipeline route as shown in the draft environmental impact statement between MPs 4.07R and 4.71R.

14.  **Prior to construction,** Texas Eastern shall revise the alignment sheets to delete Yard 6 and use the Alternate Yard 7 site on the 380 Development, LLC property;

Docket No.CP11-56-000                                                    - 63 -

                     indicate how soon to expect a response; and

        (iii)    instruct the landowners that, if they are still not satisfied with the response from the Applicants' Hotline, they shall contact the Commission's Dispute Resolution Service Helpline at 877-337-2237 or at ferc.adr@ferc.gov.

   b.    In addition, the Applicants shall include in their weekly status reports a table that contains the following information for each problem/concern:

        (i)    the identity of the caller and the date of the call;

        (ii)    the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

        (iii)    a description of the problem/concern; and

        (iv)    an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.    **Prior to receiving written authorization from the Director of OEP to commence construction of any NJ-NY Project facilities**, the Applicants shall file with the Secretary documentation that they have received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.    The Applicants must receive written authorization from the Director of OEP **before placing the authorized facilities in service**. Such authorization will only be granted following a determination that rehabilitation and restoration of areas affected by the NJ-NY Project are proceeding satisfactorily.

12.    **Within 30 days of placing the authorized facilities in service**, the Applicants shall file with the Secretary an affirmative statement, certified by a senior company official:

   a.    that the facilities have been constructed and abandoned in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

   b.    identifying which of the Certificate conditions the Applicants have complied or will comply. This statement shall also identify any areas affected by the NJ-NY Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13.    **Prior to construction**, *Texas Eastern shall file with the Secretary for review and written approval by the Director of OEP revised alignments sheets utilizing the pipeline route as shown in the draft environmental impact statement between MPs 4.07R and 4.71R.*

14.    **Prior to construction**, Texas Eastern shall revise the alignment sheets to delete Yard 6 and use the Alternate Yard 7 site on the 380 Development, LLC property;

21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000

- 64 -

file with the Secretary the revised alignment sheets showing the area to be used; and provide a description of the vegetation and other environmental resources that will be affected.

15. **Prior to construction,** the Applicants shall file with the Secretary the results of the soil and groundwater sampling program and any additional mitigation measures not included in the Excavation Management Plan for Handling Regulated Soil and Groundwater for the NJ-NY Project.

16. **Prior to construction,** Texas Eastern shall file with the Secretary additional information regarding when each 14-inch-diameter casing will be removed during the drilling and reaming process, how vertical migration of contaminants will be avoided once the casing is removed, and the justification for not using a larger diameter casing that will remain in place until the pullback is completed.

17. **Prior to construction,** Texas Eastern shall file with the Secretary revised construction alignment sheets modifying the workspace to avoid impacts on the unnamed tributary to the Upper Bay at milepost 13.5.

18. **Prior to construction,** the Applicants shall file with the Secretary a Migratory Bird Conservation Plan, developed in consultation with the New York and New Jersey Field Offices of the U.S. Fish and Wildlife Service (FWS). The Applicants shall also file copies of all correspondence from FWS regarding the development of this plan. At a minimum, the Migratory Bird Conservation Plan shall identify, by milepost, sensitive habitats that will be subject to pre-construction surveys for the migratory bird species listed in Tables 4.6.1-1 and 4.7.2-2 of the final EIS. The plan shall also address monitoring of the sensitive areas during the time windows identified in Table 4.6.1-1 of the final EIS and discuss the establishment of buffer zones around active nests until young have fledged from the nests.

19. Texas Eastern shall implement the U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service (NOAA Fisheries) recommended conservation measures for Essential Fish Habitat and file with the Secretary copies of any required plans along with any NOAA Fisheries comments on its plans.

20. **Prior to construction between Mileposts 5.68R and 8.60R,** Texas Eastern shall file with the Secretary for review and written approval by the Director of OEP, a site-specific plan addressing the concerns of Texaco Downstream Properties, Inc. and Chevron Land and Development Company (collectively, Chevron) about the slurry wall, groundwater contamination, and the timing of construction activities. This plan shall:

521-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000

- 65 -

   a.    include a diagram verifying the actual separation between the bottom of the slurry wall and the top of the horizontal directional drill (HDD) alignment;

   b.    include provisions for a pre- and post-construction assessment of the slurry wall's integrity;

   c.    include monitoring of the Kill Van Kull during construction for benzene-contaminated groundwater and include mitigation measures to contain and control any potential release of contaminated water into the river;

   d.    describe the measures that will be implemented to avoid adverse impacts on Chevron's mitigation plans; and

   e.    discuss how conflicts between pipeline construction and site remediation work will be managed if Chevron will be conducting its next remediation phase at the same time the pipeline will be constructed.

21.    **Prior to construction,** Texas Eastern shall file with the Secretary for review and written approval by the Director of OEP, a site-specific plan for the Hudson River Waterfront Walkway that includes:

   a.    a dimensioned site plan at a legible scale that clearly shows the location and description of the segment of the walkway to be affected during pipeline construction;

   b.    an estimate of the amount of time required for construction;

   c.    the day of the week and time of day during which construction activities will be completed;

   d.    the location of safety barriers and other safety features;

   e.    a detailed description of the alternate transportation/access methods to be implemented to minimize impacts on employees and transit users during construction;

   f.    a communication plan that describes the process by which affected employees and transit users will be notified in advance of construction activities and made aware of the alternate transportation/access methods available during the walkway closure; and

   g.    documentation of consultation with the New Jersey Transit and with the cities of Jersey City and Hoboken in New Jersey regarding the development of this plan.

22.    **Prior to construction,** Texas Eastern shall file with the Secretary for review and written approval by the Director of OEP its work plan for the Hudson River Park and provide documentation of consultation with the Hudson River Park Trust, as well as the New York State Department of Transportation (NYSDOT), for the activities that will occur in the NYSDOT bike path and State Route 9A.

23.    **Prior to construction,** the Applicants shall file with the Secretary a final Excavation Management Plan for Handling Regulated Soil and Groundwater for the NJ-NY Project and documentation of consultation with the New Jersey

Case 1:12-cv-03159-KAM-RER   Document 1   Filed 06/25/12   Page 76 of 78 PageID #: 76

Department of Environmental Protection and New York State Department of
Environmental Conservation regarding the plan.

24.   **Prior to construction,** Texas Eastern shall file with the Secretary final Traffic
      Management Plans for the cities of Linden, Bayonne, and Jersey City in New
      Jersey and Work Zone Traffic Control Plans for the Boroughs of Staten Island and
      Manhattan in New York City, New York, that include:
      a.   the type and estimated noise associated with the equipment to be used;
      b.   the treatment of excavated material;
      c.   pedestrian, bicycle, and worker considerations;
      d.   construction work hours; and
      e.   documentation of consultation with or approval by the applicable
           municipalities.

25.   **Prior to construction between Mileposts 10.54R to 11.21,** Texas Eastern shall
      develop and file with the Secretary for the review and written approval by the
      Director of OEP, a site-specific plan for crossing the 99 Hook Road property.  The
      plan shall be developed in consultation with the affected landowner and shall be
      provided to the landowner for review and comment prior to filing.  The plan shall
      include:
      a.   a dimensioned site plan at a legible scale that clearly shows the location and
           description of all the facilities to be affected during pipeline construction;
      b.   the feasibility of minor realignments and workspace modifications on the
           property to minimize landowner concerns;
      c.   details on how ingress and egress access will be maintained for employees
           and truck deliveries for each individual business;
      d.   quantification of unavoidable impacts (e.g., the temporary loss of parking
           spaces and impacts on truck delivery schedules) and the specific mitigation
           measures that are proposed to mitigate these effects (e.g., arrangements for
           alternate parking, coordination or modification of construction activities to
           avoid conflicts with truck deliveries and reducing the time period of
           construction and associated disruptions); and
      e.   the location of safety barriers and other safety features.

26.   The Applicants shall not begin implementation of any treatment plans/measures
      (including archaeological data recovery); construction of facilities; or use of
      staging, storage, or temporary work areas and new or to-be-improved access roads
      **until:**
      a.   the Applicants file with the Secretary cultural resources survey and
           evaluation reports, any necessary treatment plans, and the New York and
           New Jersey State Historic Preservation Officers comments on the reports
           and plans;
      b.   the Advisory Council on Historic Preservation is provided an opportunity to

Docket No.CP11-56-000                                                    - 67 -

> comment on the undertaking if historic properties will be adversely
> affected; and

c.    the Commission staff reviews and the Director of OEP approves all cultural
      resources survey reports and plans, and notifies the Applicants in writing
      that treatment plans/mitigation measures may be implemented or
      construction may proceed.

All material filed with the Secretary containing location, character, and ownership
information about cultural resources must have the cover and any relevant pages
therein clearly labeled in bold lettering: **"CONTAINS PRIVILEGED
INFORMATION – DO NOT RELEASE."**

27.   **Prior to construction,** the Applicants shall prepare, and file with the Secretary a
      Dust Control Plan that specifies the mitigation measures to be used for dust
      abatement, including specific measures to prevent contaminated soils from
      becoming airborne.

28.   **Prior to construction,** Texas Eastern shall file with the Secretary a final copy of
      its noise mitigation plans. Texas Eastern shall also file the results of its field
      measurements demonstrating the effectiveness of the proposed mitigation
      measures at the 18th Street/Long Slip and Hudson River HDDs. If the measured
      noise at these locations is determined to exceed 55 decibels on the A-weighted
      scale (dBA) day-night sound level ($L_{dn}$) at any noise sensitive area (NSA), Texas
      Eastern shall file information identifying the additional measures necessary to
      reduce the noise impact from the HDD operation below 55 dBA $L_{dn}$, and confirm
      the effectiveness of these additional measures. Texas Eastern shall also describe
      its efforts to comply with applicable local noise regulations.

29.   Texas Eastern shall file with the Secretary a noise survey **no later than 60 days**
      after placing the modified Hanover Compressor Station in service. If the noise
      attributable to the operation of the station at full load exceeds an $L_{dn}$ of 55 dBA at
      any nearby NSA, Texas Eastern shall install additional noise controls to meet that
      level **within 1 year** of the in-service date. Texas Eastern shall confirm
      compliance with the $L_{dn}$ of 55 dBA requirement by filing a second noise survey **no
      later than 60 days** after it installs the additional noise controls.

30.   The Applicants shall file with the Secretary noise surveys **no later than 60 days**
      after placing each of the new Bayonne, Jersey City, and Ramapo M&R Stations
      and modified M&R Station 70058 in service. If the noise attributable to the
      operation of any M&R Station at full load exceeds an $L_{dn}$ of 55 dBA at any nearby
      NSA, the Applicants shall file a report on what changes are needed and shall
      install the additional noise controls to meet the level **within 1 year** of the in-
      service date. The Applicants shall confirm compliance with the above

.21-3046 FERC PDF (Unofficial) 05/21/2012

Docket No.CP11-56-000

- 68 -

requirement by filing a second noise survey **no later than 60 days** after it installs the additional noise controls.